**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LORENZO MIRO SAN DIEGO, individually, on behalf of himself and all others similarly situated, | Case No._____ |
| *Plaintiff*, | |
| v. | |
| BLOCKRATIZE, INC. d/b/a POLYMARKET, ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.COM, and QCX LLC d/b/a POLYMARKET US | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lorenzo Miro San Diego ("Plaintiff"), individually and on behalf of all others similarly situated, through undersigned counsel, hereby alleges the following against Blockratize, Inc. d/b/a Polymarket, Adventure One QSS, Inc. d/b/a Polymarket.com, and QCX LLC d/b/a Polymarket US (collectively, "Defendants" or "Polymarket"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

### NATURE OF THE CASE

1. This case arises out of Defendants' operation of an illegal online sports gambling platform that is marketed as a "prediction market," but in reality, is an unlicensed sports betting enterprise prohibited under various state laws.

2. Defendants own and operate Polymarket (https://www.polymarket.com/), one of

1

the most popular prediction gambling markets on the planet.

3.    Through Polymarket, users can place bets on the outcome of sports games, individual player metrics, team results, and sometimes even a combination of events (i.e. Parlays). These bets materially resemble those offered at traditional casinos or sportsbooks.

4.    Throughout the class period, Polymarket has routinely marketed its product as betting on sports games and events. Indeed, Polymarket has repeatedly misled consumers that through its sports betting platform, they can gamble on their website.

5.    To evade regulatory scrutiny and mislead consumers, Polymarket markets itself as a "predictions market." This designation is purely cosmetic, intended to mask the reality that the platform facilitates and profits from illegal gambling.

6.    In practice, Polymarket operates in a manner virtually indistinguishable from a traditional casino and sportsbook. Players can wager real-world currency on outcomes of sports games and events, and can subsequently redeem their winnings for real-world currency. Polymarket's rapid growth and popularity are directly attributable to its realistic sportsbook like experience.

7.    The revenue of Polymarket's illegal sportsbook makes clear that it has become the platform's primary source of revenue. Indeed, a substantial portion of the bets placed on Polymarket emanated from sports betting, with the platform generating over $6 billion in earnings on sports-related bets.[1] Sports betting consistently ranks as the highest bet-upon sector on Polymarket, easily surpassing all other sectors, with sports betting also leading in highest platform

---

[1]Polymarket    Return    to    U.S.    with    $112m    Acquisition
https://newsletter.sportingcrypto.com/p/polymarket-return-to-u-s-with-112m-acquisition    (last accessed February 3, 2026) ("[t]he platform's lifetime sports-related contract volume has surpassed $6 billion, with the 2025 Super Bowl alone generating $1.1 billion in wagers, underscoring the big shift over the last 12 months from politics to sport.").

velocity. Through the massive volume of bets placed on its platform, Polymarket has experienced expedited growth, recently seeking new capital at a valuation of approximately $12 billion.[2]

8.      Polymarket is no stranger to regulatory scrutiny. In 2022, the Commodity Futures Trading Commission ("CFTC") entered an order against Polymarket, requiring that it pay a $1.4 million civil monetary penalty and that it facilitates the resolution (i.e. wind down) of all markets displayed on its website. Consequently, at that time, Polymarket ceased its operations in the United States.

9.      Polymarket has now resumed offering its platform to U.S. consumers. In doing so, it continues to operate without proper licensing or regulatory oversight, effectively perpetuating the same unregulated activities that previously prompted federal enforcement. By presenting its sports betting platform as lawful and accessible, Polymarket exposes consumers to financial risk while evading the regulatory and statutory safeguards intended to protect them.

10.      Multiple states have since cracked down on Polymarket and other similar sports betting platforms. On January 16, 2026, the Nevada Gaming Control Board announced that it asked the court for a declaration and injunction to stop Polymarket from offering what it called "unlicensed wagering in violation of Nevada law."[3] This news followed a similar action taken by the Tennessee Sports Wagering Council, who, on January 9, 2026, issued a formal cease-and-desist letter ordering Polymarket to stop offering sports event contracts to state residents, refund deposits,

---

[2] $12 Billion Valuation and an ICE Deal—Is Polymarket About to Go Public? (Nov. 20, 2025) Available at https://finance.yahoo.com/news/12-billion-valuation-ice-deal-144316346.html

[3] Nevada Gaming Control Board, *NGCB Files Civil Enforcement Action Against Polymarket* (Jan. 20, 2026), https://www.gaming.nv.gov/siteassets/content/about/press-release/ngcb-files-civil-enforcement-action-against-polymarket.pdf

and void open contracts in the state.[4]

11.    Virtual gambling is highly addictive and strictly regulated in New York and California. By law, online sports betting can only be offered by licensed operators who abide by numerous rules and regulations designed to protect the public. Polymarket continues to operate its illegal sports betting platform, through its New York headquarters, marketed and made accessible to residents of all states across the country, including those in New York and California.

12.    Through its operation of an unlicensed sports-betting platform, Polymarket has violated applicable state anti-gambling laws, engaged in deceptive practices, and unjustly enriched itself at the expense of consumers in the United States, including California and New York.

13.    Plaintiff, individually and on behalf of all other similarly situated, seeks all available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

## **PARTIES**

14.    At all times material hereto, Plaintiff has been and is a citizen of, and domiciled in, San Mateo, California.

15.    Defendant Blockratize, Inc. d/b/a Polymarket is a corporation existing and organized under the laws of Delaware, with its headquarters and principal place of business in New York City, New York. Therefore, Defendant is considered a citizen of New York for purposes of Diversity pursuant to 28 U.S.C. § 1332(d)(2). Defendant owns and/or operates Polymarket, an illegal and unregulated sports gambling website (available at https://www.Polymarket.com/), under the brand "Polymarket." Defendant conducts business within the venue of this District and

---

[4] *Tennessee Orders Kalshi, Polymarket and Crypto.com to Cease Sports Betting Contracts*, *Coindesk* (Jan. 10, 2026), available at https://www.coindesk.com/policy/2026/01/10/tennessee-orders-kalshi-polymarket-and-crypto-com-to-cease-sports-betting-contracts

throughout New York generally, which website and operations are not permitted and are illegal under New York law.

16.     Defendant Adventure One QSS, Inc. d/b/a Polymarket.com is a corporation existing and organized under the laws of Panama, with its headquarters and principal place of business at 1280 Lexington Avenue, Suite 1448, New York City, New York 10028. Therefore, Defendants is considered a citizen of New York for purposes of Diversity pursuant to 28 U.S.C. § 1332(d)(2). Defendant owns and/or operates Polymarket, an illegal and unregulated sports gambling website (available at https://www.Polymarket.com/), under the brand "Polymarket." Defendant conducts business within the venue of this District and throughout New York generally, which website and operations are not permitted and are illegal under New York law.

17.     Defendant QCX LLC d/b/a Polymarket US is a corporation existing and organized under the laws of Delaware, with its headquarters and principal place of business at 7251 W. Palmetto Park Road, Suite 102, Boca Raton, Florida 33433. Therefore, Defendant is considered a citizen of Florida for purposes of Diversity pursuant to 28 U.S.C. § 1332(d)(2). Defendant owns and/or operates Polymarket, an illegal and unregulated sports gambling website (available at https://www.Polymarket.com/), under the brand "Polymarket." Defendant conducts business within the venue of this District and throughout New York generally, which website and operations are not permitted and are illegal under New York law.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

19.    This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business and operational headquarters in New York, New York. Defendants' executive leadership, corporate decision-making, and core operational functions are directed and controlled from this District. Accordingly, Defendants are "at home" in New York and subject to general jurisdiction here.

20.    This Court also has specific personal jurisdiction over Defendants because Plaintiff's claims arise from Defendants' purposeful activities directed toward New York. Defendants designed, operated, controlled, and administered the platform, policies, payment systems, and challenged practices at issue from its New York headquarters. The misconduct alleged herein emanated from decisions and conduct occurring in this District.

21.    Defendants purposefully availed themselves of the New York market by conducting business operations from this District, employing personnel here, directing platform operations from this District, and intentionally causing effects within and outside New York, including to Plaintiff. Defendants offer Polymarket to consumers in New York and to consumers nationwide, including Plaintiff.

22.    Moreover, Defendants actively disseminate targeted marketing and advertisements within the state with the intent of promoting and selling its product and service to consumers in this District. As such, Defendants conduct business with sufficient minimum contacts in New York, and/or otherwise intentionally avails themselves to the New York market.

23.    Venue is proper in this District under the provision of 28 U.S.C. § 1391 because Defendants' principal place of business is in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

24.    The amount in controversy exceeds the jurisdictional minimum of this Court.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.    *The Problem of Online Gambling*

25.    Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

26.    Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[5] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[6]

27.    Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[7] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[8]

28.    Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[9]

---

[5]  https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed February 3, 2026).

[6] *See id.*

[7] https://www.who.int/news-room/fact-sheets/detail/gambling. (last accessed February 3, 2026).

[8]https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/ (last accessed February 3, 2026).

[9]https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed February 3, 2026).

29.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[10]

30.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[11] Online platforms, including sportsbooks, have been identified as significant contributors to this trend. These platforms often employ addictive design features to keep users engaged.

31.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

**II.    *New York law Prohibits Unlicensed Wagering and Sports Gambling***

32.    New York generally prohibits all commercial gambling, with limited exceptions. *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's strong public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759, 636 N.Y.S.2d 950 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling.").

33.    In New York, gambling occurs when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event

---

[10] https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed February 3, 2026).

[11] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed February 3, 2026).

of a certain outcome." N.Y. Penal Law § 225.00(2).[12] Both physical casinos in New York and

virtual casinos that are made available to New Yorkers online are subject to these laws. *See, e.g.*,

*People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N.Y. Cty. 1999).

34.    New York's statutory definition of "something of value" is expansive and includes:

any money or property, any token, object or article exchangeable for money or
property, or any form of credit or promise directly or indirectly contemplating
transfer of money or property or of any interest therein, or involving extension of a
service, entertainment or a privilege of playing at a game or scheme without charge.

N.Y. Penal Law § 225.00(6).

35.    Moreover, In New York, legal gambling operations are governed by the New York

Racing, Pari-Mutuel Wagering and Breeding Law. N.Y. PML §§ 100 *et seq.* Sports wagering is

regulated in PML §§ 1367 and 1367-a. Section 1367-a(2)(a) of the PML provides that "[n]o entity

shall administer, manage, or otherwise make available a mobile sports wagering platform to

persons located in New York state unless licensed with the commission."

36.    New York law defines "Sports wagering" as: "[w]agering on sporting events or any

portion thereof, or on the individual performance statistics of athletes participating in a sporting

event, or any combination of sporting events, by any system or method of wagering, including, but

not limited to, in-person communication and electronic communication through Internet websites

accessed via a mobile device or computer, and mobile device applications; provided, however, that

sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-

under bets, money line bets, pools, in-game wagering, in-play bets, proposition bets, and straight

bets."

---

[12] The Penal Law imposes no criminal liability on individual bettors, focusing instead on
bookmakers and other operations, like Defendants, that advance or profit from illegal gambling
activity. *See, e.g.*, N.Y. Penal Law § 225.10.

37.     Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401.

38.     New York also generally prohibits deceptive acts and practices, including false advertisements. *See* New York General Business Law Section 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful") and 350 ("false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

39.     Defendants blatantly disregard New York's clear prohibition on gambling. As discussed further below, the Polymarket platform allows users to place bets on the outcome of sports games, individual player metrics, team results, and/or a combination (i.e. Parlays). These bets materially resemble those offered at traditional casinos or sportsbooks.

40.     Indeed, a user that wagers on Defendants' platform is "stak[ing] or risk[ing] something of value"—real-world currency—"upon the outcome of … a future contingent event not under his control"—the results and outcomes of sports games—"upon an agreement or understanding that he will receive something of value in the event of a certain outcome"—namely, more real-world currency, should the wagered-upon outcomes of the sports event come to fruition. Thus, Polymarket's gambling sportsbook falls squarely within the ambit of New York's anti-gambling laws.

41.     On October 24, 2025, the New York State Gaming Commission sent Kalshi, Inc.—a direct competitor of Polymarket offering virtually identical sports gambling enterprise concealed under the guise of a "predictions market"—a cease-and-desist letter and warned that offering sports

gaming in New York "in connection with any sports event" under its racing laws empowers it to "levy and collect civil penalties and fines for any violation of the Racing Law."[13] Polymarket is equally subject to the same regulatory requirements and potential civil penalties for similarly operating unlawfully in New York.

### III.    *Defendants Use a "Prediction Market" as a Pretext for Real, Online Sports Gambling.*

42.    Polymarket is a private technology company founded in 2020 that operates through both a website and mobile application. Polymarket is headquartered in New York, New York and has represented its product as a "prediction market" for event contracts.

43.    Polymarket promotes its product as a "prediction market," which enables the purchase and sale of "event contracts." Event Contracts are defined as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency [] other than a change in the price, rate, value or levels of a commodity." 7 U.S.C. § 7a-2(c)(45)(C)(i). Accordingly, payment under an event contract is contingent upon whether a specified future event occurs.

44.    At its essence, Polymarket offers binary event contracts that pay out based on whether a specified future event occurred—meaning that users could bet "yes" or "no" on whether an event at issue comes to fruition. Polymarket attempts to differentiate its platform from traditional gambling by claiming that its "prediction market" is equivalent to owning a share an economic hedging function and that Polymarket derives revenue solely from transaction fees rather

---

[13]    See    https://finance.yahoo.com/news/york-state-latest-sued-kalshi-200937270.html(last accessed February 3, 2026).

than from customer losses.[14]

45.    As part of its relaunch into the U.S, Polymarket has now deliberately restructured its platform to enable illegal sports betting while disguising those wagers as event contracts. This shift constitutes a fundamental overhaul of Polymarket's business model, designed to draw users from all 50 states into unlawful sports betting on its platform despite the absence of required state licensure and regulatory oversight.

46.    Indeed, Polymarket promotes this newly formed sports-betting market as a lawful alternative to traditional sportsbooks. Shayne Coplan, Polymarket's founder and chief executive officer, proclaimed that "[u]nlike a betting site where you make a bet and it's against the house, here you own a share. You could almost say it's similar to a stock, but it's not a stock."[15]

47.    Polymarket openly markets that sports trading on its platform may be accessed in all 50 states. Here is an example of Polymarket's official X account (formerly known as Twitter) inviting users from all 50 states to bet (referred to as "trading") on football games through its platform:

---

[14]   https://www.cbsnews.com/news/polymarket-predictions-accuracy-shayne-coplan-60-minutes/ (last accessed February 3, 2026).

[15]   *Id.*



48.    Taking things a step further, Polymarket operates an Instagram account with hundreds of thousands of followers that is exclusively tailored to its sports gambling enterprise:



49.    Making matters worse, Polymarket openly flaunts the true purpose of its supposed restructure in its marketing, making clear that it allows sports betting only on football "for now"—a transparent signal of its calculated plan to expand such offerings in the future.









Terms of use    Privacy policy                                    Polymarket.com

50.     As demonstrated above, Polymarket has expressly repositioned itself as a nationwide sportsbook (at least for now), open to users in all 50 states, while consciously operating without the state licensure required to offer sports betting. In so doing, Polymarket knowingly and blatantly defies applicable state anti-gambling laws.

51.     As a result of Polymarket's operation as an illegal sportsbook, it has experienced significant and expedited growth. Notably, the platform's lifetime sports-related contract volume is estimated to have surpassed $6 billion, with the 2025 Super Bowl alone generating approximately $1.1 billion in wagers, underscoring Polymarket's big shift over the last 12 months from politics to sport.[16]

52.     As of September 2025, Polymarket's operations had evolved further into illegal

---

[16]Polymarket    Return    to    U.S.    with    $112m    Acquisition
https://newsletter.sportingcrypto.com/p/polymarket-return-to-u-s-with-112m-acquisition    (last accessed February 3, 2026).

sports gambling, offering categories strikingly similar to those in traditional sportsbooks, including point spreads, over/unders, player props, and at times, same-game parlays.

53.    Through its shift into illegal sports gambling, Polymarket now functions predominantly as a sportsbook, with over half of the bets placed on Polymarket relating to sports.[17]

54.    Indeed, the volume of sports wagers on Polymarket's platform vastly exceeds those placed by users on other event types, with sports wagering achieving the highest platform velocity ahead of all other sectors offered on Polymarket.[18] Polymarket has enjoyed significant financial gain from these operations, recently achieving a $12 billion dollar evaluation.[19] This growth is only slated to continue as more users are drawn to its unlawful sports betting operations.

## IV.    *Polymarket Deceives Consumers into Believing its Sportsbook Platform is Legal*

55.    Polymarket deliberately markets its sportsbook as a legal events platform to induce consumers to use its services. The company employs bold slogans and prominent fonts to create the impression of legality, even though its platform constitutes unlawful sports betting in violation of multiple state gambling laws.

56.    Polymarket advertises its sportsbook through various different mediums, including social media, as previously shown above.

57.    Knowingly, Polymarket continuously and intentionally promotes its platform as providing legal access to sports betting. Consumers relying on these representations are deceived into believing their wagers are lawful, when in reality, they are participating in Defendants' illegal

---

[17] *Id.*

[18] https://polymarketanalytics.com/research/polymarket-velocity (last accessed February 3, 2026).

[19] https://finance.yahoo.com/news/12-billion-valuation-ice-deal-144316346.htmlhttps://techcrunch.com/2025/11/20/source-Polymarkets-valuation-jumps-to-11b-after-raising-massive-1b-round/ (last accessed February 3, 2026).

sports betting enterprise.

58.     Despite Polymarket repeatedly marketing its platform as offering legal sports betting, in truth, it serves as an unlicensed sportsbook, mirroring the betting structures found in regulated casinos. The platform is unlawful, and consumers are tricked into wagering just like they would at a traditional sportsbook, only without the oversight and protections that legitimate sportsbooks provide.

## V.     *Polymarket's Product Enables Users to Engage in Unlawful Sports Betting*

59.     Unregulated sports betting is illegal in New York. In such betting, consumers wager on the performance of athletes or teams in a sporting event, through the establishment of betting lines. Consumers then proceed to place bets on either side, wagering on opposite ends of whether an event occurs or not.

60.     The options available on Polymarket replicate those on a licensed sportsbook, demonstrating that consumers on Polymarket are participating in wagering structures indistinguishable from traditional sportsbooks. Here is an example of the offerings on Polymarket, demonstrating that the platform is virtually indistinguishable from that of a traditional sportsbook:



61.     As seen above, Polymarket's platform emphasizes potential winnings in a visually

prominent way while downplaying the costs and odds.

62.     These features directly incentivize repeated transactions. These design elements gamify participation, and encourage rapid and repeated wagering, mirroring the behavioral hooks commonly used by digital gambling platforms.

63.     As demonstrated throughout, the conclusion is unescapable: the wagers offered by Polymarket constitute sports betting. These bets are functionally identical to those offered by traditional sportsbooks and casinos, further underscoring that consumers are engaging in unlawful sports betting while being misled about its purported legality.

64.     In New York, it is illegal to operate and offer online gambling casinos. *See* N.Y. Const. art. I, § 9; N.Y. Gen. Oblig. L. § 5-401. In this regard, New York has a fundamental and deep-rooted public policy against gambling.

65.     Despite New York's clear prohibition on online gambling, Polymarket operates an unlicensed and illegal online sports betting enterprise within New York, as discussed further below.

66.     Users of Polymarket stake or risk something of value when wagering on sports games on Defendants' platform. Specifically, players wager real-world currency for the possibility of winning more real-world currency on sports events, the outcomes of which are determined predominantly by chance rather than skill. In essence, Polymarket mirrors the fundamental mechanics of real-money gambling, in which players risk a valuable consideration for the opportunity to win additional value.

67.     Under New York law, a game of chance is considered any "contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." N.Y. Penal Law § 225.00(1); *see also White v. Cuomo*, 38 N.Y.3d 209, 228, 192 N.E.3d 300 (2022) (holding that

the Constitutional prohibition on gambling reaches "the staking of value on a game in which the element of chance predominates over the element of skill[.]").

68.    Polymarket's platform requires consumers to stake or risk "something of value upon the outcome of a contest of chance or a future contingent event not under their control or influence, upon an agreement or understanding that they will receive something of value in the event of a certain outcome," thereby violating Racing Law § 1367(1)(t).

69.    Racing Law § 1367-a(4)(b) provides that "[n]o entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." Polymarket violates this provision by operating an unlicensed sports wagering platform in New York and advertising that platform to New York residents.

70.    The facts are clear: Polymarket's unlicensed sports wagering operations violate New York law and undermines the State's regulatory scheme. By operating outside the licensing system, Polymarket avoids the robust taxes paid by lawful operators and evades the oversight mechanisms that New York relies upon to monitor gambling activity, including ensuring that legalized gambling is conducted in a manner consistent with the State's values and public policy.

71.    In sum, Polymarket permits illegal wagering on sporting games predicated on outcomes that are completely determined by chance. By offering the ability to engage in unlawful sports betting, Defendants is operating an unregulated online casino in violation of New York law, which explicitly prohibits gambling on games of chance conducted over the internet. N.Y. Gen. Oblig. L. § 5-401; N.Y. Penal Law § 225.00(1).

**VI.    *Defendants Offers Gambling Without Statutory Consumer Protections***

72.    The harm caused by Polymarket's illegal gambling operation is further exacerbated

by its lack of accountability and regulatory oversight. Unlike licensed casinos and sportsbooks, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

73.    Defendants' illegal sportsbook actively undermines critical consumer protections required by New York law. For example, upon information and belief, Defendants allows anybody over the age of 18 to gamble on their platform in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in New York. *See, e.g.*, N.Y. RAC. PARI- MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor."); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities."); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee").

74. Upon information and belief, Defendants further disregard the consumer protection laws that require casinos and sportsbooks to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9 § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877- 8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities."); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.")

75. Moreover, New York law prohibits sports betting in New York on New York college

sports teams. Yet, those exact wagers may be found on Polymarket. For example, in the image below Polymarket offers bets on Syracuse University's football team:



*Screen capture of Polymarket's website dated Feb. 2, 2026, displaying wagers on New York college sports teams*

## VII.    *States are Cracking Down on Unlawful Sports Betting*

76.    As discussed above, numerous states have begun to crack down on these unlawful sports betting operations. On January 16, 2026, Nevada state regulators filed an enforcement action against Polymarket asking the court for a declaration and injunction to stop Polymarket from offering unlicensed wagering in violation of Nevada law.[20] Similarly, Tennessee regulators have

---

[20] Nevada Gaming Control Board, *NGCB Files Civil Enforcement Action Against Polymarket* (Jan. 20, 2026), https://www.gaming.nv.gov/siteassets/content/about/press-release/ngcb-files-civil-enforcement-action-against-polymarket.pdf

recently ordered Polymarket to stop offering sports event contracts to state residents, citing unlicensed gambling.[21]

77.    Many other states will likely follow suit. An akin platform, Kalshi, similarly offers illegal sports betting under the guise of prediction markets. State Attorney Generals and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have sent letters ordering Kalshi to cease and desist offering illegal sports betting under the guise of prediction markets. The Massachusetts Attorney General similarly concluded Kalshi's "event contracts" are illegal sports betting, and brought a lawsuit.[22]

78.    Additionally, in October 2023, the New York Gaming Commission adopted New York Rule 5602.1(a)(4), which explicitly outlaws this kind of "proposition betting," or bets made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's final outcome. That regulation states that "[c]ontests shall not be based on proposition betting or contests that have the effect of mimicking proposition betting. Contests in which a contestant must choose, directly or indirectly, whether an individual athlete or a single team will surpass an identified statistical achievement, such as points scored, are prohibited."[23]

79.    Polymarket will likely continue to face enforcement actions from numerous states. Accordingly, Plaintiff, on behalf of the putative class, seek judicial recourse to alleviate the damages suffered as a result of participating in Polymarket's illegal gambling platform.

---

[21] *Tennessee Orders Kalshi, Polymarket and Crypto.com to Cease Sports Betting Contracts*, *Coindesk* (Jan. 10, 2026), available at https://www.coindesk.com/policy/2026/01/10/tennessee-orders-kalshi-polymarket-and-crypto-com-to-cease-sports-betting-contracts

[22] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations.

[23] N.Y. Comp. Codes R. & Regs. tit. 9, § 5602.1(a)(4).

## FACTS SPECIFIC TO PLAINTIFF

*Plaintiff's Experience*

80.    In response to Polymarket's online advertising and representations described above, and under the belief that he was engaging in "legal" sports betting, Plaintiff wagered on Polymarket from approximately September 2025 to November 2025 during which he placed multiple wagers on different sporting events on Defendants' platform.

81.    Plaintiff accessed and Plaintiff placed wagers on sporting events on Polymarket.

82.    Plaintiff placed a substantial amount of sports wagers on Polymarket.

83.    Overall, Plaintiff wagered and lost thousands of dollars in real-world currency while using Polymarket and betting on its offering of sports games and events.

84.    By and through Polymarket's gambling features described above, during the time period of approximately September 2025 to November 2025, Plaintiff was induced into placing sports bets that he otherwise would not have made if he knew that Polymarket's platform constituted illegal gambling in violation of numerous state laws.

85.    As a result of Defendants' unfair, unlawful, and deceptive acts, Defendants were unjustly enriched.

86.    Plaintiff enjoys legally wagering on sports and has an ongoing interest in utilizing Polymarket's platform if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore has an ongoing interest in Polymarket complying with state and federal gambling laws and consumer protection statutes.

87.    Defendants' representations regarding the legality of their sports betting platform are unlawful, unfair, deceptive, and misleading, because Defendants failed to warn consumers that the platform is illegal, while allowing consumers, including Plaintiff, to rely on those

representations in deciding to utilize Defendants' platform.

88.     Defendants' representations were material to Plaintiff's decision to utilize Polymarket.

89.     In deciding to utilize Polymarket, Plaintiff relied on the marketing and advertising prepared and approved by Defendants concerning the legality of their platform, as disseminated through their social media channels containing the misrepresentations alleged herein.

90.     Had Plaintiff known that Defendants platform was an illegal sports betting enterprise, Plaintiff would not have utilized Polymarket. In other words, Defendants' representation of legality was important to Plaintiff's decision to utilize Polymarket.

91.     Each time Plaintiff and putative Class members utilized Polymarket, they relied on Defendants' representations in their purchasing decisions, as is typical of most U.S. consumers.

92.     Plaintiff was harmed because Defendants took Plaintiff's money due to their unlawful, false, unfair, and deceptive misrepresentations of their product, including the product Plaintiff utilized.

93.     Consequently, Plaintiff and other similarly situated consumers were deceived by Defendants' false, unlawful, unfair, and deceptive acts.

94.     Although Plaintiff would like to utilize Polymarket in the future, Plaintiff cannot be certain that he will not be misled again unless and until Defendants accurately represents its product.

## **CLASS ALLEGATIONS**

95.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

96.     The Class is defined as follows:

**Nationwide Class**: All United States residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**New York Class**: All New York residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**Statute of Anne Multistate Class**: All residents of Statute of Anne States who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**California Class**: All California residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

97.     The "Statute of Anne States" means Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Florida (Fla. Stat. §§ 849.12, 849.26, 849.29), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1), Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Maryland (Md. Code Ann., Crim. Law § 12-110), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Michigan (Mich. Comp. Laws §§ 730.315(1), 600.2939(1)), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), West Virginia (W. Va. Code § 55-9-2); Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.02), Mississippi (Miss. Code Ann. § 87-1-5), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.74), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. Ann. § 895.056).

98.     The Nationwide Class, New York Class, Statute of Anne Multistate Class, and the

California Class are collectively referred to herein as the "Class," unless specified otherwise.

99.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

100.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiff currently but may be ascertained from Defendants' books and records and other third-party sources.

101.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

      a.   Whether the sports betting in Polymarket is gambling as defined under applicable state law;

      b.   Whether Defendants engaged in the conduct alleged in the Complaint;

      c.   Whether Defendants violates the statutes listed below in Counts I, II, III, IV, V, and VI;

      d.   Whether Defendants violated statutes analogous to those alleged herein applicable;

    e.   Whether and how Defendants manipulate the betting odds in games offered on Polymarket;

    f.   Whether Plaintiff and the other Class members were damaged by Defendants' conduct; and

    g.   Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

102.   **Typicality**. Plaintiff's claims are typical of the claims of the Class because he is a player of Polymarket who wagered real-world currency on sports games and events as a result of Defendants' unlawful and wrongful conduct. The factual and legal basis of Defendants' liability to Plaintiff and to the other Class members is the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendants' unlawful and wrongful conduct.

103.   **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

104.   **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by

Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

105.    **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## FIRST CAUSE OF ACTION
### Violation of the New York Loss Recovery Act
### N.Y. Gen. Oblig. L. § 5-419
### *(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)*

106.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105 by reference as if fully set forth herein.

107.    Plaintiff brings this count individually and on behalf of the Class under New York General Obligation Law § 5-419, which was enacted to effectuate the State's public policy against unlawful gambling.

108.    All forms of unlicensed gambling—including wagers, bets, or stakes—based on games of chance are unlawful in New York. N.Y. Gen. Oblig. L. § 5-401.

109.    Section 5-419 of the Loss Recovery Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." N.Y. Gen. Oblig. L. § 5-419.

110.    Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager or bet—and permits the person who paid or lost the money to recover it from the recipient.

111.    Defendants' gambling sportsbook solicits "wager[s] or bet[s] prohibited" because it invites users to play games of chance (e.g., betting on the outcomes of sporting events) for money, which constitutes illegal gambling under both New York civil and penal law. *See* N.Y. Gen. Oblig. L. § 5-401 ("All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."); N.Y. Penal Law § 225.00 (defining "gambling" as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance" and defining "gambling device," as "any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine."); N.Y. Penal Law §§ 225.05225.10 (making advancing and profiting from unlawful gambling a misdemeanor or felony).

112.    Defendants' online sportsbook platform is an internet site that permits consumers to play games of chance (e.g., bet on the outcome of sporting events) for money.

113.    Every wager offered on Defendants' online platform is a "gambling device" because it accepts money from players, operates on chance as it relies on the outcomes of sporting events and games, and enable players to stake, hazard, and bet money with the potential to win or lose money.

114.    Defendants are considered the "winner" because they derive a financial benefit from the gambling activity. Every transaction generates revenue for Defendants, meaning their financial interest is tied to facilitating the illegal gambling alleged herein.

115.    Defendants are also a "stakeholder" under this provision of the Loss Recovery Statute because, on information and belief, the money wagered by Plaintiff and the Class on Defendants' platform is delivered or deposited into accounts owned or controlled by it.

116.    By purchasing, wagering, and losing money on Defendants' sports betting platform, Plaintiff and each member of the Class gambled and lost money.

117.    Defendants own, operate, and control the gambling games described herein, and directly profited from Plaintiff's and the Class members' gambling losses. Defendants is therefore the "winner" under N.Y. Gen. Oblig. Law § 5-419 of all moneys lost by Plaintiff and the Class members.

118.    Defendants operate an illegal gambling website that is accessible Nationwide, including in New York.

119.    Defendants operate its illegal gambling enterprise from its headquarters in New York. Defendants also process online consumer payments in New York.

120.    Plaintiff, on behalf of himself and the Class members, seeks an order requiring Defendants to (1) cease the operation of their gambling business, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law § 5-419.

**SECOND CAUSE OF ACTION**
**Violation of New York General Business Law § 349 (Deceptive Acts and Practices)**
***(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)***

121.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105 by reference as if fully set forth herein.

122.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a).

123.    N.Y. Gen. Bus. Law § 349 applies to Defendants' actions and conduct as described herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or practices in business transactions, including those involving the marketing and sale of goods or services to New York consumers.

124.    Plaintiff and the members of the Class are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

125.    Defendants engaged in consumer-oriented conduct by marketing Polymarket as legal sports betting, when it is unlicensed, and while concealing the fact that its platform constitutes unlawful gambling with real financial risks.

126.    Defendants also violated § 349 by misrepresenting its products as "prediction markets" when it is an addictive and dangerous gambling enterprise.

127.    Defendants' practices described herein, including the operation of an illegal sports betting casino, are deceptive under N.Y. Gen. Bus. Law § 349 because they contravene New York's public policy against unlawful and unregulated gambling, and caused substantial injury to the consumers who wagered on Polymarket.

128.    Defendants caused substantial injury to Plaintiff and the Class by inducing them to wager real-world currency through the design of its illegal gambling platform. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

129.    Defendants' unfair practices occurred during the marketing and sale of sports wagers on Polymarket's illegal gambling platform, and thus, occurred in the course of trade and commerce.

130.    Further, Defendants conceal from consumers, including Plaintiff and the Class, that

wagering on its platform constitutes illegal gambling prohibited by state law.

131.    To make matters worse, upon information and belief, Defendants disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. See, e.g., N.Y. Comp. Codes R. & Regs. Tit. 9, § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (8778-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission"); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.2 ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities"); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements").

132.    Defendants aggressively market and advertise its platform through various media while at the same time concealing that it is illegal under state law. As such, consumers, including Plaintiff and the Class, are highly likely to continue to encounter current and future iterations of Defendants' illegal platform absent injunctive relief.

133.    Further, Defendants' conduct is deceptive because it is designed to encourage illegal gambling while marketing the platform as a legal avenue to engage in sports betting, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

134.    These deceptive practices are material and likely to mislead reasonable consumers, who are led to believe they are participating in legal sports betting rather than unlawful, unregulated gambling.

135.    As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law § 349, Plaintiff and Class members have suffered actual injury in the form of monies lost wagering on Defendants' platform.

136.    Plaintiff, on behalf of himself and the Class members, seeks an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any sports wager to Plaintiff and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### THIRD CAUSE OF ACTION
**Violation of New York General Business Law § 350 (False Advertising)**
***(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)***

137.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105 by reference as if fully set forth herein.

138.    N.Y. Gen. Bus. Law § 350 prohibits "[f]alse advertising in the conduct of any

business, trade or commerce or in the furnishing of any service in this state." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1).

139.    Defendants engaged in false advertising by marketing and promoting Polymarket as legal sports betting across all 50 states, when in fact Defendants operate an unlawful online gambling platform that allows players to wager real-world currency for money.

140.    Defendants further misrepresent sports betting on Polymarket as simply a byproduct of its "predictions market" platform rather than an unlicensed online sportsbook. By doing so, Defendants misleads consumers into believing the platform is lawful and does not constitute illegal sports wagering involving real financial risk.

141.    Defendants' advertisements fail to disclose that the Polymarket sports betting platform operates in violation of New York law, that consumers are engaging in real-money gambling, and that users are wagering things of value that can be lost while wagering on Defendants' platform. These omissions are material because they would influence a reasonable consumer's decision to engage with and make purchases on Defendants' platform.

142.    A reasonable consumer is likely to be misled by Defendants' advertising into believing that Polymarket offers legal sports betting rather than unlawful gambling with real financial risks.

143.    Defendants' false advertising was directed at the public at large and occurred in the course of Defendants' business practices within New York.

144.    Defendants aggressively market Polymarket through targeted advertisements on social media, digital marketing campaigns, and other promotional efforts aimed at attracting nationwide and New York consumers. These advertisements emphasize legal sports wagering,

large potential winnings, and enticing promotions while concealing the true nature of Defendants'

illegal gambling operation.

145.    Defendants' false and misleading advertising deceived Plaintiff and Class

members, leading them to engage with and place wagers through Polymarket under the mistaken

belief that they were not participating in illegal gambling.

146.    As a direct and proximate result of Defendants' false advertising, Plaintiff and the

Class have suffered actual damages in the form of monies lost on Defendants' illegal gambling

platform.

147.    Plaintiff, on behalf of himself and Class members, seeks an order requiring

Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired

through any sports wager to Plaintiff and the Class, and otherwise (3) pay damages, interest, and

reasonable attorneys' fees, together with costs and expenses.

**FOURTH CAUSE OF ACTION**
**Violation of N.Y. Gen. Oblig. L. § 5-421**
***(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)***

148.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105

by reference as if fully set forth herein.

149.    N.Y. Gen. Oblig. L. § 5-421 states that "[e]very person who shall, by playing at any

game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or

value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may,

within three calendar months after such payment or delivery, sue for and recover the money or

value of the things so lost and paid or delivered, from the winner thereof."

150.    Within the past three months, Plaintiff deposited at least twenty-five dollars into

accounts owned and controlled by Defendants for the purpose of engaging in what Plaintiff was

misled to believe was lawful sports betting, but in reality, was unlawful betting and/or wagering.

151.    Plaintiff lost the money he deposited by engaging in Defendants' unlawful betting and/or wagering games.

152.    Pursuant to N.Y. Gen. Oblig. L. § 5-421, Plaintiff and the Class are entitled to recover from Defendants all funds lost in connection with Defendants' unlawful sports betting and/or wagering enterprise.

153.    Accordingly, Plaintiff and the Class seek all damages, restitution, attorneys' fees, and costs of suit and/or injunctive relief.

### FIFTH CAUSE OF ACTION
**Unlawful & Unfair Business Practices in Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(*On behalf of Plaintiff and the California Class*)**

154.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105 by reference as if fully set forth herein.

155.    California's Unfair Competition Law ("UCL") broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200.

156.    Plaintiff and Defendants are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

157.    Plaintiff has standing under the UCL because he suffered an injury in fact and lost money or property as a result of Defendants' unlawful and unfair conduct.

158.    By hosting and facilitating the unlawful online sports betting platform at issue here, Defendants engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful and unfair business acts and practices.

159.    Unlicensed sports wagering has long been outlawed in California. The sportsbook offered on Defendants' platform constitutes illegal sports betting as directly prohibited by

California law.

160.    Defendants engage in unlawful business practices by operating prediction markets in California that are in fact illegal sports wagers prohibited under Penal Code § 337a. Funds wagered in Polymarket's platform are wagers on the uncertain performance of third-party athletes and teams in real-world contests. The Attorney General of California has previously concluded that such contests are unlawful gambling under California law.

161.    Defendants further engage in unfair business practices because its conduct offends established public policy, is immoral and unscrupulous, and causes substantial consumer injury that is not outweighed by any countervailing benefits. California has long prohibited sports wagering due to its addictive nature and destructive impact on families and communities. Defendants exploit consumers by promoting rapid-fire contests, enticing large payouts, and encouraging loss-chasing behaviors, all while ensuring their own profit through the retention of transaction fees.

162.    Defendants also engage in fraudulent business practices by misrepresenting the sports betting it offers as legal sports betting, when it is unlicensed and unregulated.

163.    Defendants' conduct as alleged herein occurred in the course of trade or commerce.

164.    As described herein, Defendants have committed unlawful and unfair business acts or practices in violation of the UCL.

165.    As a result of engaging in the conduct alleged in this Complaint, Defendants has also violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, *inter alia*, the following laws:

    a.    **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control Act provide

that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Polymarket's prediction markets constitute unlawful "gambling games" because they are games "played for currency… or any other thing of value" in which money is staked upon the outcome of uncertain athletic events. Cal. Penal Code § 337j(a)(1). Defendants have not applied for or obtained any state gambling license as statutorily required by California law, and therefore violate California's Gambling Control Act.

b. **California Penal Code § 330a**: Section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money,

representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Polymarket's platform constitutes such a contrivance: consumers deposit money through the website to stake on athletic outcomes set by the operator, and winnings or losses are determined by the operation of Defendants' software. Defendants' conduct therefore plainly violates Penal Code § 330a.

c. **California Penal Code § 330b**: Section 330b prohibits the manufacture, possession, or operation of "any slot machine or device" that awards money or things of value depending on chance. Polymarket's mobile software functions as a prohibited "device" under this statute. The combination of Polymarket's platform and consumers' mobile devices transforms phones into gambling machines in this context. Indeed, users "deposit" entry fees, the system calculates outcomes based on uncertain sporting events, and the app pays out money or credits to winning users. Defendants therefore violate Penal Code § 330b.

d. **California Penal Code § 337j(a)(1)**: Defendants violate Cal. Penal Code § 337j(a)(1) by "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed sports gambling in California through its platform.

e. **California Penal Code § 337j(a)(2)**: Defendants violate Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Polymarket profits by retaining a guaranteed transaction fee from every wager placed on its platform.

f. **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the "IGBA")**: The IGBA declares it a crime to "conduct, finance, manage, supervise, direct, or own all of part" of an illegal gambling business. Defendants violate the IGBA because their business involves five or more persons, has been in continuous operation for more than thirty days, and violates California's gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct alleged herein, Defendants squarely violate 18 U.S.C. § 1955.

g. **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) (the "UIGEA")**: The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly accept payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is defined as placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 15 U.S.C. § 5362(10)(a). Polymarket knowingly accepts deposits from

consumers in California to fund its illegal sportsbook. Because these wagers are unlawful under California law, they also constitute "unlawful Internet gambling" within the meaning of the UIGEA. By accepting consumer payments in connection with these illegal wagers, Defendants violate the UIGEA.

166.    Through its unfair and deceptive acts and practices, Defendants improperly obtained money from Plaintiff and members of the Class. As such, Plaintiff respectfully requests that this Court cause Defendants to restore this money to Plaintiff and members of the California Class, and to enjoin Defendants from continuing to violate the UCL. Otherwise, Plaintiff and members of the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

167.    Accordingly, Plaintiff and the Class lack an adequate remedy at law. Moreover, Plaintiff asserts this cause of action in the alternative to his claims for damages.

168.    As a direct and proximate cause of Defendants' deceptive and unfair trade practices, Plaintiff and other members of Class suffered an injury in fact and/or lost money and property as described above.

169.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff seeks an injunction on behalf of the general public enjoining Defendants from continuing to engage in the conduct described herein as Defendants' wrongful conduct continues to be ongoing.

170.    Plaintiff also seeks rescission and an order requiring Defendants to make full restitution and to disgorge their ill-gotten gains wrongfully obtained from members of the California Class as permitted by Bus. & Prof. Code § 17203.

171.    Additionally, Plaintiff and the Class members seek an order requiring Defendants to

pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

## SIXTH CAUSE OF ACTION
### Violation of CLRA, Cal. Civ. Code § 17500, *et seq.*
### (*On behalf of Plaintiff and the California Class*)

172.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105 by reference as if fully set forth herein.

173.    Plaintiff brings this cause of action on behalf of himself and the Class.

174.    The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.,* prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result, or which results, in the sale or lease of goods or services to a consumer.

175.    Plaintiff and each member of the proposed Class are consumers as defined by Cal. Civ. Code. § 1761(d).

176.    Polymarket's online platform and mobile app constitutes a "service" within the meaning of by Cal. Civ. Code. § 1761(b).

177.    Defendants violated, and continues to violate, the CLRA by, *inter alia*, misrepresenting the sports betting offered on Polymarket as "legal sports betting," when it is unlicensed and unregulated; representing that its services are legal and permitted in California when they are not; and deceiving or confusing reasonable consumers about the probability of winning their bets, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior.

178.    Defendants' wrongful conduct deceives and confuses customers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winning and the obligation to pay for losses), when in fact any such rights, remedies or

obligations are prohibited by law.

179.     Defendants misrepresented and marketed their platform as a "prediction market" while actually offering illegal sports-betting and/or wagering that are identical to those found in traditional sportsbooks.

180.     Defendants' conduct and actions are deceptive, untrue, and misleading to reasonable consumers, and will continue to mislead consumers in the future.

181.     Plaintiff and the California Class relied on Defendants' advertisements, representations and/or omissions. Had they known the true nature of Polymarket's platform, they would not have paid Defendants money or used Polymarket.

182.     As a direct and proximate result of Defendants' misconduct, Plaintiff and California Class members have suffered and will continue to suffer actual damages.

183.     Defendants' wrongful conduct is ongoing and presents a continuing threat to Class members.

184.     Pursuant to § 1782(a) of the CLRA, Plaintiff's counsel has or will contemporaneously notify Defendants in writing by certified mail of its particular violations of § 1770 of the CLRA and demand that it rectifies the problems associated with the actions detailed above, and give notice to all affected consumers of Defendants' intent to act. If Defendants fail to respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, as proscribed by §1782, Plaintiff will move to amend his Complaint to pursue claims for actual, punitive and statutory damages, as appropriate against Defendants.  As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment

*(On behalf of Plaintiff, the Nationwide Class, the New York Class, the California Class, and the Statute of Anne Multistate Class)*

185.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–103 by reference as if fully set forth herein.

186.    Plaintiff and the Class members have conferred a benefit upon Defendants in the form of the money they wagered on Defendants' illegal sportsbook platform.

187.    Defendants appreciate and has knowledge of the benefits conferred upon it by Plaintiff and the Class.

188.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the Class members, which Defendants has unjustly obtained as a result of their unlawful operation of wagering sports games. As it stands, Defendants have retained millions of dollars in profits generated from Polymarket's unlawful sports betting and should not be permitted to retain those ill-gotten profits.

189.    Accordingly, Plaintiff and the Class members seek full disgorgement of all money Defendants has retained as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2.    Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.      Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4.      Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.      Awarding pre- and post-judgment interest, as allowable by law;

6.      For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7.      Declaratory and equitable relief, including restitution and disgorgement;

8.      For public injunctive and declaratory relief as the Court may deem proper; and

9.      Awarding such further and other relief as the Court deems just, proper and equitable.

### JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.


Dated: February 4, 2026                    Respectfully submitted,


                                           By: */s/ Leanna A. Loginov*
                                           Leanna A. Loginov (NY Bar No. 5894753)
                                           Edwin Elliott*
                                           **SHAMIS & GENTILE, P.A.**
                                           14 NE 1st Ave., Suite 705
                                           Miami, FL 33132
                                           Telephone: 305-479-2299
                                           lloginov@shamisgentile.com
                                           edwine@shamisgentile.com

                                           Omer Kremer *
                                           Gabriel Mandler*
                                           **EDELSBERG LAW, P.A.**
                                           20900 NE 30th Ave., Suite 417
                                           Aventura, FL 33180
                                           Tel: (786) 289-9470
                                           omer@edelsberglaw.com

gabriel@edelsberglaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff and the Proposed Class*