## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORENZO MIRO SAN DIEGO, individually, and on behalf of all others similarly situated,<br><br>　　　　*Plaintiff*,<br><br>　　　　v.<br><br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET, ADVENTURE ONE QSS, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, QC CLEARING, LLC d/b/a POLYMARKET CLEARING, QC TECH LLC d/b/a PM US TECH, and DOES 1-20,<br><br>　　　　*Defendants*. | Case No. 1:26-cv-00973-MMG<br><br><br>Hon. Margaret M. Garnett |

### AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lorenzo Miro San Diego ("Plaintiff"), individually and on behalf of all others similarly situated, through undersigned counsel, hereby alleges the following against Blockratize, Inc. d/b/a Polymarket, Adventure One QSS, Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, QC Clearing, LLC d/b/a Polymarket Clearing, QC Tech LLC, d/b/a PM US Tech, and Does 1-20 (collectively, "Defendants" or "Polymarket"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

### NATURE OF THE CASE

1.　　　This case arises out of Defendants' operation of an illegal gambling platform throughout the United States.

2.　　　Defendants own and/or operate Polymarket, one of the most popular and profitable

1

prediction gambling markets on the planet.

3.    Through Polymarket, users wager real-life currency on the outcomes of events, including sports games, individual player metrics, team results, and a combination of outcomes (*i.e.*, parlays). These wagers materially resemble those offered by traditional casinos and sportsbooks, as users may redeem any winnings for real-world currency.

4.    Throughout the class period, Polymarket has consistently marketed its platform as safe, legal, and authorized to provide sports gambling, thereby misleading consumers.

5.    To evade regulatory scrutiny and mislead consumers, Polymarket markets itself as a "predictions market." This designation is purely cosmetic, intended to mask the reality that the platform facilitates and profits from illegal gambling.

6.    Through the massive volume of bets and wagers placed on its platform, Polymarket has experienced expedited growth, recently seeking new capital at a valuation of approximately $12 billion.[1]

7.    Recently, multiple states have cracked down on Polymarket and other similar prediction market gambling platforms. On January 16, 2026, the Nevada Gaming Control Board sought a declaration and injunction to stop Polymarket from offering what it called "unlicensed wagering in violation of Nevada law."[2] On January 29, 2026, the court granted a temporary

---

[1] $12 Billion Valuation and an ICE Deal—Is Polymarket About to Go Public? (Nov. 20, 2025) Available at https://finance.yahoo.com/news/12-billion-valuation-ice-deal-144316346.html (last accessed March 23, 2026)

[2] Nevada Gaming Control Board, *NGCB Files Civil Enforcement Action Against Polymarket* (Jan. 20, 2026), https://www.gaming.nv.gov/siteassets/content/about/press-release/ngcb-files-civil-enforcement-action-against-polymarket.pdf (last accessed March 23, 2026)

restraining order, prohibiting Polymarket from operating in the state.[3] This news followed a similar action taken by the Tennessee Sports Wagering Council, who, on January 9, 2026, issued a formal cease-and-desist letter ordering Polymarket to stop offering sports event contracts to state residents, refund deposits, and void open contracts in the state.[4]

8.      Multiple state regulators have taken the position that Polymarket's sports-event contracts constitute unlicensed sports wagering, issuing cease-and-desist directives in several jurisdictions. State Attorney Generals and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have sent letters to Polymarket's biggest competitor, Kalshi, ordering it to cease and desist its illegal sports betting platform, signaling increased regulatory scrutiny of the entire industry.[5]

9.      Further confirming the regulatory concerns that the Polymarket platform propagates, on February 2, 2026, Letitia James, the New York Attorney General, warned consumers of the "significant risks" of participating in Defendants' "unregulated prediction markets," highlighting that "in practice, [prediction markets] operate[s] as unregulated gambling without the basic protections New York consumers both deserve and expect from properly licensed

---

[3]     https://news3lv.com/news/local/nevada-gaming-regulators-win-temporary-restraining-order-against-polymarket (last accessed March 23, 2026)

[4] *Tennessee Orders Kalshi, Polymarket and Crypto.com to Cease Sports Betting Contracts*, *Coindesk* (Jan. 10, 2026), available at https://www.coindesk.com/policy/2026/01/10/tennessee-orders-kalshi-polymarket-and-crypto-com-to-cease-sports-betting-contracts (last accessed March 23, 2026)

[5] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations (last visited March 23, 2026).

operators[.]"[6]

10.     Virtual gambling is highly addictive and strictly regulated in New York, California, and a multitude of other states. By law, online sports betting can only be offered by licensed operators who abide by numerous rules and regulations designed to protect the public. Polymarket continues to operate its illegal sports betting platform, through its New York headquarters, marketed and made accessible to residents of all states across the country, including those in New York and California.

11.     Through its operation of an unlicensed sports-betting platform, Polymarket has violated applicable state anti-gambling laws, engaged in deceptive practices, and unjustly enriched itself at the expense of consumers in the United States, including New York and California.

12.     Plaintiff, individually and on behalf of all other similarly situated, seeks all available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

## PARTIES

13.     At all times material hereto, Plaintiff has been and is a citizen of, and domiciled in, San Mateo, California.

14.     Defendant Blockratize, Inc. d/b/a Polymarket is a corporation incorporated in Delaware and headquartered in New York, New York. Therefore, Defendant is considered a citizen of New York and Delaware for purposes of diversity pursuant to 28 U.S.C. § 1332(d)(2). Blockratize is the sole owner of QCX LLC, QC Clearing, LLC, and QC Tech LLC, and has operated Polymarket from New York since its inception in 2020. Blockratize is believed to conduct

---

[6]     https://www.cnbc.com/2026/02/02/new-york-ag-prediction-markets-super-bowl-warning.html (last accessed March 23, 2026)

substantial business across the United States, including in this District, and derives substantial revenue from those operations. On January 27, 2026, Blockratize filed a U.S. trademark application for Polymarket.[7]

15.    Defendant Adventure One QSS, Inc. d/b/a Polymarket is a corporation organized under the laws of Panama with its headquarters and principal place of business at 1280 Lexington Avenue, New York, New York 10028. Defendant is a citizen of New York and Panama for purposes of diversity pursuant to 28 U.S.C. § 1332(d)(2). Defendant owns and/or operates Polymarket and conducts substantial business in the United States, including in this District, to derive substantial revenue from those operations.

16.    Defendants QCX LLC (d/b/a "Polymarket US"), QC Clearing LLC (d/b/a "Polymarket Clearing") (collectively "QCEX"), and QC Tech LLC (d/b/a "PM US Tech") comprise Blockratize's American event-based prediction market and clearinghouse, and each are limited liability companies organized under the laws of Delaware. QCEX was purchased by Defendant Blockratize in July 2025 for the purpose of restarting Blockratize's gambling operations in the United States.[8] QCEX is believed to conduct substantial business across the United States, including in this District, and to derive substantial revenue from those operations, and are operationally directed and controlled by Blockratize personnel located in New York, New York.

17.    Blockratize, Inc. is the sole member of QCX LLC, QC Clearing LLC, and QC Tech

---

[7]  https://www.trademarkelite.com/trademark/trademark-detail/99617077/POLYMARKET? (last accessed March 23, 2026)

[8]  Ross, K., *Polymarket acquires QCEX for $112M*, https://blockworks.co/news/polymarket-qcex-acquisition (last viewed March 23, 2026)

LLC. Because Blockratize, Inc. is a citizen of New York and Delaware, QCX LLC, QC Clearing LLC, and QC Tech LLC are each therefore citizens of New York and Delaware for purposes of diversity jurisdiction.

18.     Defendant Does 1-20 are individuals and/or entities who facilitate Defendants' unlawful practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiff. The Doe defendants, and the Polymarket entities, are collectively referred to in this Complaint as "Defendants" or "Polymarket." Plaintiff expressly reserves the right to amend this Complaint to add the Doe defendants by name, once their identities are known.

19.     Each Defendant is a "person" and/or engages in "business" and has transacted business within this District by offering, marketing, facilitating, and profiting from purported event-contract products to consumers residing in and/or accessing the platforms within this state and across the country.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because: (i) Plaintiff (and at least one member of the Class) is a citizen of a different state than Defendants; (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and (iii) none of the exceptions under that subsection apply to this action.

21.     This Court has general personal jurisdiction over Defendants Blockratize, Inc. and Adventure One QSS, Inc. because they maintain their principal place of business and operational headquarters in New York, New York, and because Defendants regularly conduct business within this District. Defendants' executive leadership, corporate decision-making, and core operational functions are directed and controlled from this District. Accordingly, these Defendants are "at home" in New York.

22.     This Court also has general personal jurisdiction over Defendants QCX LLC, QC Clearing LLC, and QC Tech LLC. Although these entities are organized under Delaware law, they are wholly owned and controlled by Blockratize, Inc., which directs their operations from New York. Blockratize, Inc. is the sole member of each LLC, and accordingly, for purposes of personal jurisdiction, these LLCs share the citizenship and forum contacts of their sole member. Moreover, upon information and belief, key operational decisions for these entities—including decisions regarding platform functionality, compliance, user agreements, and marketing—are made by Blockratize personnel located in New York.

23.     This Court also has specific personal jurisdiction over Defendants because Plaintiff's claims arise out of and relate to Defendants' purposeful activities directed from New York. Defendants designed, developed, operated, and controlled the Polymarket platform, its policies, payment systems, and the challenged practices at issue from their New York headquarters. The misconduct alleged herein emanated from decisions and conduct occurring in this District. Upon information and belief, Defendants' marketing campaigns, including advertisements promoting purportedly lawful wagering nationwide and to Plaintiff, were directed from this District. Plaintiff's injuries are directly traceable to these New York-based decisions and conduct.

24.     Defendants purposefully availed themselves of the privilege of conducting business in New York market by maintaining their corporate headquarters in this District, employing personnel here, directing platform operations from this District, engaging in continuous and systematic business activities here, and intentionally causing effects within and outside New York, including to Plaintiff. Defendants offer Polymarket in New York and to consumers nationwide, including Plaintiff.

25.     Moreover, Defendants actively disseminate targeted marketing and advertisements

within the state with the intent of promoting and selling its product and service to consumers in this District. As such, Defendants conduct business with sufficient minimum contacts in New York, and/or otherwise intentionally avails themselves to the New York market.

26.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District within the meaning of 28 U.S.C. § 1391(c), and the remaining entity Defendants-QCX LLC, QC Clearing LLC, and QC Tech LLC-are subject to personal jurisdiction in this District and therefore also reside here for venue purposes.

27.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants' operations emanate from this District and involve commerce that flows to and from this District. Thus, a substantial part of the events or omissions giving rise to the claims occurred in this District.

28.     The amount in controversy exceeds the jurisdictional minimum of this Court.

### **FACTUAL BACKGROUND AND COMMON ALLEGATIONS**

I.     *The Problem of Online Gambling*

29.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including prediction markets.

30.     Since the Supreme Court's 2018 decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[9] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[10]

---

[9]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?  (last accessed March 23, 2026).

[10] *See id*.

31.    Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[11] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[12]

32.    Between 2018 and 2021, the National Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[13]

33.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[14]

34.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[15] Online platforms, including sportsbooks, have been identified as significant contributors to this trend. These platforms often employ addictive design features to keep users engaged.

---

[11] https://www.who.int/news-room/fact-sheets/detail/gambling. (last accessed March 23, 2026).

[12] https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/ (last accessed March 23, 2026).

[13] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed March 23, 2026).

[14] https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed March 23, 2026).

[15] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed March 23, 2026).

35.     The problem extends to minors as well. Studies indicate that 36% of boys aged 11 to 17 have gambled in the past year, and 60% of children in that age range have seen gambling advertisements on social media. Mobile gaming companies' tactics, driven by sophisticated machine learning models, are highly effective at capturing attention but also exploit individuals with addictive tendencies by encouraging continued or escalated gambling.

36.     The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM 5-TR) classifies gambling disorder as the only defined behavioral addiction in the manual. Symptoms include the need to gamble with increasing amounts of money to achieve the desired excitement, being restless or irritable when attempting to cut down or stop gambling, repeated unsuccessful efforts to control, cut back, or stop gambling, and lying to family members, a therapist, or others to conceal the extent of involvement with gambling.

37.     The rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. According to a review by the National Council on Problem Gambling ("NCPG"), the rate of problems is even higher among those who bet on sports online: 16% met clinical criteria for gambling disorder and another 13% showed some signs of problematic gambling behavior.

38.     Research from MIT Sloan has documented that the legalization and expansion of sports betting leads to higher credit card balances, reduced available credit, decreased net investments, and greater lottery participation, with these effects being particularly pronounced among financially constrained households.[16] Legalized sports betting is also associated with statistically significant declines in credit scores, a 25 to 30 percent increase in bankruptcies, and

---

[16]https://mitsloan.mit.edu/sites/default/files/inline-files/Session3_Paper3_Gambling%20Away%20Stability.pdf (last accessed March 23, 2026)

an 8 percent increase in debts being transferred to collectors.[17] Notably, states that permitted online gambling experienced close to three times the decline in credit scores as states that allowed gambling but not online betting, and also experienced increased auto loan delinquencies and debt consolidation loan use.

39.    The harms of sports betting extend beyond financial injury. Research has documented that legalized sports betting amplifies intimate partner violence when a home team unexpectedly loses.[18] Gambling disorder carries the highest suicide rate of any addiction disorder, with one in five individuals having attempted suicide.[19] The pressures that sports betting puts on college athletes may also be a contributing factor to the rise in suicidality for this group.

40.    The addiction and fallout related to sports betting is therefore not strictly limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains wholly insufficient, meaning that the vulnerable populations that gambling exploits will likely never get the treatment they desperately need.

## II.    *New York Law Prohibits Unlicensed Wagering and Sports Gambling*

41.    In *Murphy,* the Supreme Court confirmed that states, not the federal government, may regulate sports betting.

42.    Since then, more than 40 states and territories have enacted legislative and regulatory schemes that both permit licensed sports betting and prohibit the operation of gambling enterprises that violate state regulations, such as by failing to register with the state.

---

[17] *Id.*

[18] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4938642 (last accessed March 23, 2026)

[19] *Id.*

43. New York, for instance, generally prohibits all commercial gambling, with limited exceptions. *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's strong public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759, 636 N.Y.S.2d 950 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling.").

44. Courts have confirmed that virtual casinos and online gambling operations are subject to New York's gambling prohibitions. *See People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N York Cty. 1999) (holding that an online gambling operation accessible in New York violated New York gambling laws).

45. In New York, gambling occurs when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).[20]

46. New York's statutory definition of "something of value" is expansive and includes:

> any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

N.Y. Penal Law § 225.00(6).

47. Moreover, in New York, legal gambling operations are governed by the New York Racing, Pari-Mutuel Wagering and Breeding Law. N.Y. PML §§ 100 *et seq.* Sports wagering is regulated in PML §§ 1367 and 1367-a. Section 1367-a(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to

---

[20] The Penal Law imposes no criminal liability on individual bettors, focusing instead on bookmakers and other operations, like Defendants, that advance or profit from illegal gambling activity. *See, e.g.*, N.Y. Penal Law § 225.10.

persons located in New York state unless licensed with the commission."

48.    New York law defines "Sports wagering" as: "[w]agering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or any combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through Internet websites accessed via a mobile device or computer, and mobile device applications; provided, however, that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line bets, pools, in-game wagering, in-play bets, proposition bets, and straight bets." PML § 1367(x).

49.    Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401.

50.    New York also generally prohibits deceptive acts and practices, including false advertisements. *See* New York General Business Law Section 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful") and 350 ("false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

51.    Defendants blatantly disregard New York's clear prohibition on gambling. As discussed further below, the Polymarket platform allows users to place bets on the outcome of sports games, individual player metrics, team results, and/or a combination (*i.e.* parlays). These bets materially resemble those offered at traditional casinos or sportsbooks.

52.    Indeed, a user that wagers on Defendants' platform is "stak[ing] or risk[ing]

something of value"—real-world currency—"upon the outcome of … a future contingent event not under his control"—the results and outcomes of sports games—"upon an agreement or understanding that he will receive something of value in the event of a certain outcome"—namely, real-world currency, should the wagered-upon outcomes of the sports event come to fruition. Thus, Polymarket's gambling sportsbook falls squarely within the ambit of New York's anti-gambling laws.

53.     On October 24, 2025, the New York State Gaming Commission sent Kalshi, Inc.—a direct competitor of Polymarket offering virtually identical sports gambling enterprise concealed under the guise of a "predictions market"—a cease-and-desist letter and warned that offering sports gaming in New York "in connection with any sports event" under its racing laws empowers it to "levy and collect civil penalties and fines for any violation of the Racing Law."[21] Polymarket is equally subject to the same regulatory requirements and potential civil penalties for similarly operating unlawfully in New York.

### III.    *California Continues to Ban Forms of Sports Betting*

54.     For over 150 years, California has broadly prohibited commercialized gambling.

55.     For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

56.     A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v.*

---

[21] *See* https://finance.yahoo.com/news/york-state-latest-sued-kalshi-200937270.html; *see also* https://nexteventhorizon.substack.com/p/kalshi-sues-new-york  (last accessed March 23, 2026).

*Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants but is not directly involved in game play. *See id. at* 679.

57.     Similarly, California Penal Code Section 337a prohibits additional conduct, including:

a.     "*Pool selling* or *bookmaking*, with or without writing, at *any time or place.*" CAL. PENAL CODE § 337a(a)(1) (emphasis added);

b.     *"[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever,* any *money . . . staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(3) (emphasis added);

c.     "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(4) (emphasis added); and

d.     "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus.*" *Id.* at (a)(6) (emphasis added).

58.     The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

59.     California voters have overwhelmingly rejected the legalization of online sports betting. In 2022, California voters rejected Proposition 26, a Native American tribe-sponsored ballot initiative that would have legalized in-person sports betting at tribal casinos, by a margin of 67% to 33%. That same year, California voters rejected Proposition 27—an online sports betting industry-sponsored ballot initiative that would have legalized online sports betting—by a margin of 82% to 18%, one of the largest margins of defeat in California ballot proposition history. It was touted that the sports betting industry reportedly spent $150 million on political advertisements in support of Proposition 27.[22] Despite this resounding rejection of online sports betting, Polymarket has nonetheless chosen to offer its illegal sports betting platform to California consumers.

IV.     ***Defendants Use a "Prediction Market" as a Pretext for Real, Online Sports Gambling.***

60.     Polymarket operates through both a website and mobile application.

61.     Polymarket promotes its product as a "prediction market," which enables the

---

[22] Gus Garcia-Roberts, Inside the $400 million fight to control California sports betting, WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last accessed March 23, 2026).

purchase and sale of "event contracts." Event Contracts are defined as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency [] other than a change in the price, rate, value or levels of a commodity." 7 U.S.C. § 7a-2(c)(45)(C)(i). Accordingly, payment under an event contract is contingent upon whether a specified future event occurs.

62.    At its essence, Polymarket offers binary event contracts that pay out based on whether a specified future event occurred—meaning that users may bet "yes" or "no" on whether an event at issue comes to fruition. Polymarket attempts to differentiate its platform from traditional gambling by claiming that its "prediction market" is equivalent to owning a share with an economic hedging function and that Polymarket derives revenue solely from transaction fees rather than from customer losses.[23]

63.    The logistics of each wager are simple. First, a user selects a market (colloquially known as a "polymarket"). Second, the user bets "Yes" or "No"—as Polymarket instructs users to "[p]lace a bet"—buying and odds shift in real time as other users bet. Users can fund their wagers using crypto, credit or debit card, or bank transfer, and, upon information and belief, there are no bet limits. Third, the user can sell their Yes or No shares at any time, or wait until the market ends to redeem winning shares for $1 each. Polymarket makes money by raking in a fee on each transaction and also charges a separate fee for certain deposit and withdrawal methods.

64.    In essence, Polymarket matches bettors on opposite sides of the event contract so that the combined wager from both bettors equals $1.00. If the price changes, bettors may "sell" their wager to other bettors before the event takes place. In fact, the Platform tells users they can

---

[23] https://www.cbsnews.com/news/polymarket-predictions-accuracy-shayne-coplan-60-minutes/ (last accessed March 23, 2026).

"[c]reate an account and place [their] first trade in minutes."

65.    Accordingly, the use of the term "event contract" is merely an attempt to disguise Polymarket's provision of unlawful gambling and sports betting. Whether characterized as "shares," "contracts," or "bets," the fundamental economic reality is the same: users wager real money on the outcome of sporting events in the hopes of financial gain. That is textbook sports gambling.

66.    As part of its relaunch into the United States, Polymarket has now deliberately restructured its platform to enable illegal sports betting while disguising those wagers as event contracts. This shift constitutes a fundamental overhaul of Polymarket's business model, designed to draw users from all 50 states into unlawful sports betting on its platform despite the absence of required state licensure and regulatory oversight.

67.    As part of its marketing push, upon information and belief, Polymarket regularly purchases advertisements on numerous social media platforms, including Facebook and Instagram, to specifically target states that have not legalized sports betting, including California.

68.    Examples of Polymarket's deceptive advertising include Meta advertisements with taglines such as: "BREAKING: Legal football trading is coming to ALL 50 states this fall"; "You've seen the takes. Now you can trade them legally in all 50 states. Download Polymarket now"; and "Trade sports live like stocks. No house edge, lowest fees, and legal in every state. Download today for a $10 bonus – no deposit required." These advertisements are deliberately designed to induce consumers to believe that Polymarket's sports betting platform is legal throughout the United States when, in fact, it is not.

69.    In addition, Polymarket also targets other states where sports gambling is illegal by reposting text messages promoting the legality of sports betting, including but not limited to

18

Georgia and many others.[24]

70.    Indeed, Polymarket promotes its sports-betting market as a lawful alternative to traditional sportsbooks. Shayne Coplan, Polymarket's founder and chief executive officer, proclaimed that "[u]nlike a betting site where you make a bet and it's against the house, here you own a share. You could almost say it's similar to a stock, but it's not a stock."[25]

71.    Polymarket openly markets that sports trading on its platform may be accessed in all 50 states. Here is an example of Polymarket's official X account (formerly known as Twitter) inviting users from all 50 states to bet (referred to as "trading") on football games through its platform:



72.    Taking things a step further, Polymarket operates an Instagram account with hundreds of thousands of followers that is exclusively tailored to its sports gambling enterprise:

---

[24]    https://casinobeats.com/2025/08/22/polymarket-ads-target-states-with-no-sports-betting-signal-u-s-relaunch-for-football-season/ (last accessed March 23, 2026).

[25]    https://www.cbsnews.com/news/polymarket-predictions-accuracy-shayne-coplan-60-minutes/ (last accessed March 23, 2026).



73.     Making matters worse, Polymarket runs advertisements that explicitly liken its sports betting operations to trading "stocks," but admits it provides "odds," continuing to purport its legality in every state despite not obtaining necessary licensure.

74.     Compounding its mockery of state anti-gambling laws, Polymarket openly flaunts the true purpose of its supposed restructure in its marketing, making clear that it allows sports betting only on football "for now"—a transparent signal of its calculated plan to expand such offerings in the future.



75.    As demonstrated above, Polymarket has expressly repositioned itself as a nationwide sportsbook (at least for now), open to users in all 50 states, while consciously operating without the state licensure required to offer sports betting. In so doing, Polymarket knowingly and blatantly defies applicable state anti-gambling laws.

76.    As of September 2025, Polymarket's operations had evolved further into illegal sports gambling, offering categories strikingly similar to those in traditional sportsbooks, including point spreads, over/unders, player props, and at times, same-game parlays.

**V.    *Polymarket Deceives Consumers into Believing its Sportsbook Platform is Legal***

77.    Polymarket deliberately markets its sportsbook as a legal events platform to induce consumers to use its services. The company employs bold slogans and prominent fonts to create the impression of legality, even though its platform constitutes unlawful sports betting in violation of multiple state gambling laws.

78.    Polymarket advertises its sportsbook through various different mediums, including

social media, as previously shown above.

79.    Knowingly, Polymarket continuously and intentionally promotes its platform as providing legal access to sports betting. Consumers relying on these representations are deceived into believing their wagers are lawful, when in reality, they are participating in Defendants' illegal sports betting enterprise.

80.    Despite Polymarket repeatedly marketing its platform as offering legal sports betting, in truth, it serves as an unlicensed sportsbook, mirroring the betting structures found in regulated casinos. The platform is unlawful, and consumers are tricked into wagering just like they would at a traditional sportsbook, only without the oversight and protections that legitimate sportsbooks provide.

## VI.    *Polymarket's Product Enables Users to Engage in Unlawful Sports Betting*

81.    Unregulated sports betting is illegal in New York. In such betting, consumers wager on the performance of athletes or teams in a sporting event, through the establishment of betting lines. Consumers then proceed to place bets on either side, wagering on opposite ends of whether an event occurs or not.

82.    The options available on Polymarket replicate those on a licensed sportsbook, demonstrating that consumers on Polymarket are participating in wagering structures indistinguishable from traditional sportsbooks. Here is an example of the offerings on Polymarket, demonstrating that the platform is virtually indistinguishable from that of a traditional sportsbook:




83.    Polymarket's Platform is designed to encourage high-risk transactions by emphasizing reward while obscuring risk. These features directly incentivize repeated transactions by gamifying participation and encouraging rapid and repeated wagering, mirroring the behavioral hooks commonly used by digital gambling platforms. In fact, the volume of sports wagers on Polymarket's platform vastly exceeds those placed by users on other event types, with sports wagering achieving the highest platform velocity of all sectors offered on the Platform.

### VII.    *Defendants Offer Gambling Without Statutory Consumer Protections*

84.    The harm caused by Polymarket's illegal gambling operation is further exacerbated by its lack of accountability and regulatory oversight. Unlike licensed casinos and sportsbooks, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

85.    Polymarket provides no safeguards to prevent widespread addiction, financial ruin or risk of loss, or provide education to users that supposed "event contracts" constitute a form of highly addictive gambling. Polymarket allows anyone to open an account and start placing bets, after entering basic personal information, so long as the individual is at least 18 years old and can provide a single verifying document.

86.    Polymarket also did not uniformly implement robust geolocation or age-verification, self-exclusion, or helpline placements required of licensed operators. Additionally, Polymarket's risk warnings were hard to locate behind continuously updating home-page content. Polymarket does not provide any resources or information to a bettor who is seeking responsible gambling messaging or help for financial loss or gambling addiction.

87.    Under New York law, minors are prohibited from placing sports wagers, and individuals under the age of 21 are prohibited from gambling at licensed facilities. See N.Y. Comp. Codes R. & Regs. tit. 9, §§ 5313.2(b), 5329.19(a). Polymarket's failure to implement robust age verification mechanisms means that minors and underage individuals may be—and likely are—accessing and gambling on the platform in violation of New York law.

88.    Even if a bettor voluntarily self-excludes from Polymarket, there is no indication

24

whether that bettor would automatically be removed from all Polymarket marketing lists.

89.    Defendants' illegal sportsbook actively undermines critical consumer protections required by New York law. For example, upon information and belief, Defendants allows anybody over the age of 18 to gamble on their platform in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in New York. *See, e.g.*, N.Y. RAC. PARI- MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) (**"**A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor."); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities."); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee").

90.    Upon information and belief, Defendants further disregard the consumer protection laws that require casinos and sportsbooks to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9 § 5325.2(a)

(requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877- 8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities."); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.").

91.     Moreover, New York law prohibits sports betting in New York on New York college sports teams. Yet, those exact wagers may be found on Polymarket. For example, in the image below Polymarket offers bets on Syracuse University's football team:



*Screen capture of Polymarket's website dated Feb. 2, 2026, displaying wagers on New York college sports teams*

## VIII.  *Polymarket's History*

92.    Polymarket is no stranger to regulatory scrutiny. In 2022, the Commodity Futures Trading Commission ("CFTC") entered an order against Polymarket, requiring that it pay a $1.4 million civil monetary penalty and that it facilitates the resolution (i.e. wind down) of all markets displayed on its website. Consequently, at that time, Polymarket ceased its operations in the United States.

93.    Specifically, in its January 3, 2022 enforcement order, the CFTC found that Polymarket's event contracts constitute "swaps" under the Commodity Exchange Act ("CEA"), and that Polymarket had operated an unregistered facility in violation of the CEA. The order required Polymarket to pay a $1.4 million civil monetary penalty and to wind down all markets on

its platform, including by geo-blocking United States users.

94.     Following this order, Polymarket continued to grow internationally, becoming the world's largest prediction market by volume, while ostensibly barring U.S. users from accessing the platform.

95.     Following the CFTC's 2022 enforcement order, Polymarket restructured its operations by ceding nominal "operator" responsibilities for its international exchange to Adventure One QSS, Inc.. However, upon information and belief, this restructuring was largely cosmetic. For instance, Polymarket's CEO, Shayne Coplan, served as Adventure One's president from December 2021 through April 2022 and remained a director of Adventure One thereafter.[26]

96.     As of around December 2025, Polymarket resumed offering its platform to U.S. consumers. In doing so, it continues to operate without proper licensing or regulatory oversight, effectively perpetuating the same unregulated activities that previously prompted federal enforcement. By presenting its betting platform as lawful and accessible, Polymarket exposes consumers to financial risk while evading the regulatory and statutory safeguards intended to protect them.

## IX.     *Polymarket Fails to Warn Consumers of Legal Challenges to Its Sports Betting Operations*

97.     As previously referenced, Polymarket is purportedly regulated by the Commodity Futures Trading Commission (CFTC), but fails to adequately warn consumers that Polymarket is facing numerous legal challenges to their offering of sports wagering bets online.

---

[26] What is Polymarket doing in Panama? https://www.sportico.com/business/sports-betting/2026/polymarket-panama-adventure-one-prediction-market-1234885035/ (When Coplan stepped down as president, he was replaced by Harry Jones, who simultaneously held the title of Director of Global Affairs at Polymarket. This confirms that Adventure One and Blockratize are far more intertwined than publicly represented.) (last accessed March 23, 2026).

98.     Multiple state regulators have taken the position that Polymarket's sports-event contracts constitute unlicensed sports wagering, issuing cease-and-desist directives in several jurisdictions. And that is likely to increase with time; State Attorney Generals and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have sent letters to Polymarket's biggest competitor, Kalshi, ordering it to cease and desist its illegal sports betting platform.

99.     Moreover, in response to the Nevada Gaming Control Board's Complaint against Defendants, a Nevada state-court judge granted a temporary restraining order prohibiting Polymarket from operating in the state.

## X.     *Polymarket Acted with Malice, Oppression, and Fraud.*

100.    As detailed in this Complaint, Polymarket has acted with malice, oppression, and fraud.

101.    Polymarket acted with malice because, among other reasons and as otherwise detailed in this Complaint, Polymarket's conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiff, and the Class because Polymarket knew (or should have known) that its gambling operations were illegal, but despite that induced Plaintiff and the Class to gamble and lose money through its platform. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

102.    Polymarket's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiff and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that Polymarket held out

as being legal.

103.    Polymarket's conduct was fraudulent because, among other reasons and as otherwise detailed in this Complaint, Polymarket intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiff and the Class by affirmatively representing that its platform and associated contests were legal when Polymarket knew (or should have known) that such contests were not.

**FACTS SPECIFIC TO PLAINTIFF**

*Plaintiff's Experience*

104.    In response to Polymarket's online advertising and representations described above, and under the belief that he was engaging in "legal" sports betting, Plaintiff wagered on Polymarket from approximately September 2025 to November 2025 during which he placed multiple wagers on different sporting events on Defendants' platform.

105.    Plaintiff accessed and Plaintiff placed wagers on sporting events on Polymarket.

106.    Plaintiff placed a substantial amount of sports wagers on Polymarket.

107.    Overall, Plaintiff wagered and lost thousands of dollars in real-world currency while using Polymarket and betting on its offering of sports games and events.

108.    By and through Polymarket's gambling features described above, during the time period of approximately September 2025 to November 2025, Plaintiff was induced into placing sports bets that he otherwise would not have made if he knew that Polymarket's platform constituted illegal gambling in violation of numerous state laws.

109.    As a result of Defendants' unfair, unlawful, and deceptive acts, Defendants were unjustly enriched.

110.    Plaintiff enjoys legally wagering on sports and has an ongoing interest in utilizing

Polymarket's platform if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore has an ongoing interest in Polymarket complying with state and federal gambling laws and consumer protection statutes.

111.    Defendants' representations regarding the legality of their sports betting platform are unlawful, unfair, deceptive, and misleading, because Defendants failed to warn consumers that the platform is illegal, while allowing consumers, including Plaintiff, to rely on those representations in deciding to utilize Defendants' platform.

112.    Defendants' representations were material to Plaintiff's decision to utilize Polymarket.

113.    In deciding to utilize Polymarket, Plaintiff relied on the marketing and advertising prepared and approved by Defendants concerning the legality of their platform, as disseminated through their social media channels containing the misrepresentations alleged herein.

114.    Had Plaintiff known that Defendants platform was an illegal sports betting enterprise, Plaintiff would not have utilized Polymarket. In other words, Defendants' representation of legality was important to Plaintiff's decision to utilize Polymarket.

115.    Each time Plaintiff and putative Class members utilized Polymarket, they relied on Defendants' representations in their purchasing decisions, as is typical of most U.S. consumers.

116.    Plaintiff was harmed because Defendants took Plaintiff's money due to their unlawful, false, unfair, and deceptive misrepresentations of their product, including the product Plaintiff utilized.

117.    Consequently, Plaintiff and other similarly situated consumers were deceived by Defendants' false, unlawful, unfair, and deceptive acts.

118.    Although Plaintiff would like to utilize Polymarket in the future, Plaintiff cannot

31

be certain that he will not be misled again unless and until Defendants accurately represents its product.

## CLASS ALLEGATIONS

119.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

120.    The Class is defined as follows:

**Nationwide Class**: All United States residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**New York Class**: All New York residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**Statute of Anne Multistate Class**: All residents of Statute of Anne States who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**California Class**: All California residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

121.    The "Statute of Anne States" means Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Florida (Fla. Stat. §§ 849.12, 849.26, 849.29), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1), Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Maryland (Md. Code Ann., Crim. Law § 12-110), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Michigan (Mich. Comp. Laws §§ 730.315(1), 600.2939(1)), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), West Virginia (W. Va. Code § 55-9-2); Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. §

13-8-3(b)), Minnesota (Minn. Stat. § 541.02), Mississippi (Miss. Code Ann. § 87-1-5), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.74), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. Ann. § 895.056).

122.    The Nationwide Class, New York Class, Statute of Anne Multistate Class, and the California Class are collectively referred to herein as the "Class," unless specified otherwise.

123.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

124.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiff currently but may be ascertained from Defendants' books and records and other third-party sources.

125.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.  Whether the sports betting in Polymarket is gambling as defined under applicable state law;

b.  Whether Defendants engaged in the conduct alleged in the Complaint;

c.  Whether Defendants violate the statutes listed below in Counts I, II, III, IV, V, and VI;

d.  Whether Defendants violated statutes analogous to those alleged herein applicable;

e.  Whether Plaintiff and the other Class members were damaged by Defendants' conduct;

f.  Whether Plaintiff and the other Class members are entitled to restitution or other relief;

g.  Whether Polymarket violated New York Racing, Pari-Mutuel Wagering and Breeding Law § 1367;

h.  Whether Polymarket's representations about the legality of sports betting in New York and California were true or misleading;

i.  Whether Polymarket violates California gambling laws, including California Penal Code §§ 319, 330, 330a, 337a, and 337j;

j.  Whether Polymarket's conduct violates established public policy against unlicensed online sports betting;

k.  Whether the sports betting contracts on Polymarket's platform are void under applicable law; and

l.  Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, and other equitable relief.

126.  **Typicality**. Plaintiff's claims are typical of the claims of the Class because he is a

34

player of Polymarket who wagered real-world currency on sports games and events as a result of Defendants' unlawful and wrongful conduct. The factual and legal basis of Defendants' liability to Plaintiff and to the other Class members is the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendants' unlawful and wrongful conduct.

127.   **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

128.   **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

129.   **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members,

and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**Violation of the New York Loss Recovery Act**
**N.Y. Gen. Oblig. L. § 5-419**
*(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)*

130. Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

131. Plaintiff brings this count individually and on behalf of the Class under New York General Obligation Law § 5-419, which was enacted to effectuate the State's public policy against unlawful gambling.

132. All forms of unlicensed gambling—including wagers, bets, or stakes—based on games of chance are unlawful in New York. N.Y. Gen. Oblig. L. § 5-401.

133. Section 5-419 of the Loss Recovery Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." N.Y. Gen. Oblig. L. § 5-419.

134. Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager or bet—and permits the person who paid or lost the money to recover it from the recipient.

135. Defendants' gambling sportsbook solicits "wager[s] or bet[s] prohibited" because it invites users to play games of chance (e.g., betting on the outcomes of sporting events) for money, which constitutes illegal gambling under both New York civil and penal law. *See* N.Y. Gen. Oblig. L. § 5-401 ("All wagers, bets or stakes, made to depend upon any race, or upon any gaming

36

by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."); N.Y. Penal Law § 225.00 (defining "gambling" as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance" and defining "gambling device," as "any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine."); N.Y. Penal Law §§ 225.05225.10 (making advancing and profiting from unlawful gambling a misdemeanor or felony).

136. Defendants' online sportsbook platform is an internet site that permits consumers to play games of chance (e.g., bet on the outcome of sporting events) for money.

137. Every wager offered on Defendants' online platform is a "gambling device" because it accepts money from players, operates on chance as it relies on the outcomes of sporting events and games, and enable players to stake, hazard, and bet money with the potential to win or lose money.

138. Defendants are considered the "winner" because they derive a financial benefit from the gambling activity. Every transaction generates revenue for Defendants, meaning their financial interest is tied to facilitating the illegal gambling alleged herein.

139. Defendants are also a "stakeholder" under this provision of the Loss Recovery Statute because, on information and belief, the money wagered by Plaintiff and the Class on Defendants' platform is delivered or deposited into accounts owned or controlled by it.

140. By purchasing, wagering, and losing money on Defendants' sports betting platform, Plaintiff and each member of the Class gambled and lost money.

141. Defendants own, operate, and control the gambling games described herein, and directly profited from Plaintiff's and the Class members' gambling losses. Defendants are therefore

the "winner" under N.Y. Gen. Oblig. Law § 5-419 of all moneys lost by Plaintiff and the Class members.

142.   Defendants operate an illegal gambling website that is accessible Nationwide, including in New York.

143.   Defendants operate its illegal gambling enterprise from its headquarters in New York. Defendants also process online consumer payments in New York.

144.   Plaintiff, on behalf of himself and the Class members, seeks an order requiring Defendants to (1) cease the operation of their gambling business, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law § 5-419.

## SECOND CAUSE OF ACTION
**Violation of New York General Business Law § 349 (Deceptive Acts and Practices)**
*(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)*

145.   Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

146.   New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a).

147.   N.Y. Gen. Bus. Law § 349 applies to Defendants' actions and conduct as described herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or practices in business transactions, including those involving the marketing and sale of goods or services to New York consumers.

148.   Plaintiff and the members of the Class are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

149.   Defendants engaged in consumer-oriented conduct by marketing Polymarket as

38

legal sports betting, when it is unlicensed, and while concealing the fact that its platform constitutes unlawful gambling with real financial risks.

150. Defendants also violated § 349 by misrepresenting its products as "prediction markets" when it is an addictive and dangerous gambling enterprise.

151. Defendants' practices described herein, including the operation of an illegal sports betting casino, are deceptive under N.Y. Gen. Bus. Law § 349 because they contravene New York's public policy against unlawful and unregulated gambling, and caused substantial injury to the consumers who wagered on Polymarket.

152. Defendants caused substantial injury to Plaintiff and the Class by inducing them to wager real-world currency through the design of its illegal gambling platform. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

153. Defendants' unfair practices occurred during the marketing and sale of sports wagers on Polymarket's illegal gambling platform, and thus, occurred in the course of trade and commerce.

154. Further, Defendants conceal from consumers, including Plaintiff and the Class, that wagering on its platform constitutes illegal gambling prohibited by state law.

155. To make matters worse, upon information and belief, Defendants disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 9, § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the

39

commission quarterly updates and an annual summary of its problem gambling plan and goals");
§ 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (8778-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission"); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1 ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities"); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements").

156.    Defendants aggressively market and advertise its platform through various media while at the same time concealing that it is illegal under state law. As such, consumers, including Plaintiff and the Class, are highly likely to continue to encounter current and future iterations of Defendants' illegal platform absent injunctive relief.

157.    Further, Defendants' conduct is deceptive because it is designed to encourage illegal gambling while marketing the platform as a legal avenue to engage in sports betting, as well as to exploit psychological triggers associated with gambling and addiction in order to target

40

susceptible populations.

158.    These deceptive practices are material and likely to mislead reasonable consumers, who are led to believe they are participating in legal sports betting rather than unlawful, unregulated gambling.

159.    As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law § 349, Plaintiff and Class members have suffered actual injury in the form of monies lost wagering on Defendants' platform.

160.    Plaintiff, on behalf of himself and the Class members, seeks an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any sports wager to Plaintiff and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### THIRD CAUSE OF ACTION
**Violation of New York General Business Law § 350 (False Advertising)**
*(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)*

161.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

162.    N.Y. Gen. Bus. Law § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1).

163.    Defendants engaged in false advertising by marketing and promoting Polymarket as legal sports betting across all 50 states, when in fact Defendants operate an unlawful online gambling platform that allows players to wager real-world currency for money.

164.    Defendants further misrepresent sports betting on Polymarket as simply a

byproduct of its "predictions market" platform rather than an unlicensed online sportsbook. By doing so, Defendants misleads consumers into believing the platform is lawful and does not constitute illegal sports wagering involving real financial risk.

165. Defendants' advertisements fail to disclose that the Polymarket sports betting platform operates in violation of New York law, that consumers are engaging in real-money gambling, and that users are wagering things of value that can be lost while wagering on Defendants' platform. These omissions are material because they would influence a reasonable consumer's decision to engage with and make purchases on Defendants' platform.

166. A reasonable consumer is likely to be misled by Defendants' advertising into believing that Polymarket offers legal sports betting rather than unlawful gambling with real financial risks.

167. Defendants' false advertising was directed at the public at large and occurred in the course of Defendants' business practices within New York.

168. Defendants aggressively market Polymarket through targeted advertisements on social media, digital marketing campaigns, and other promotional efforts aimed at attracting nationwide and New York consumers. These advertisements emphasize legal sports wagering, large potential winnings, and enticing promotions while concealing the true nature of Defendants' illegal gambling operation.

169. Defendants' false and misleading advertising deceived Plaintiff and Class members, leading them to engage with and place wagers through Polymarket under the mistaken belief that they were not participating in illegal gambling.

170. As a direct and proximate result of Defendants' false advertising, Plaintiff and the Class have suffered actual damages in the form of monies lost on Defendants' illegal gambling

platform.

171.    Plaintiff, on behalf of himself and Class members, seeks an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any sports wager to Plaintiff and the Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**FOURTH CAUSE OF ACTION**
**Violation of N.Y. Gen. Oblig. L. § 5-421**
*(On Behalf of Plaintiff, the Nationwide Class, and the New York Class)*

172.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

173.    N.Y. Gen. Oblig. L. § 5-421 states that "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

174.    Within the past three months, Plaintiff deposited at least twenty-five dollars into accounts owned and controlled by Defendants for the purpose of engaging in what Plaintiff was misled to believe was lawful sports betting, but in reality, was unlawful betting and/or wagering.

175.    Plaintiff lost the money he deposited by engaging in Defendants' unlawful betting and/or wagering games.

176.    Pursuant to N.Y. Gen. Oblig. L. § 5-421, Plaintiff and the Class are entitled to recover from Defendants all funds lost in connection with Defendants' unlawful sports betting and/or wagering enterprise.

177.    Accordingly, Plaintiff and the Class seek all damages, restitution, attorneys' fees,

and costs of suit and/or injunctive relief.

**FIFTH CAUSE OF ACTION**

**Unlawful & Unfair Business Practices in Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(*On behalf of Plaintiff and the California Class*)**

178.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

179.    California's Unfair Competition Law ("UCL") broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200.

180.    Plaintiff and Defendants are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

181.    Plaintiff has standing under the UCL because he suffered an injury in fact and lost money or property as a result of Defendants' unlawful and unfair conduct.

182.    By hosting and facilitating the unlawful online sports betting platform at issue here, Defendants engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful and unfair business acts and practices.

183.    Unlicensed sports wagering has long been outlawed in California. The sportsbook offered on Defendants' platform constitutes illegal sports betting as directly prohibited by California law.

184.    Defendants engage in unlawful business practices by operating prediction markets in California that are in fact illegal sports wagers prohibited under Penal Code § 337a. Funds wagered in Polymarket's platform are wagers on the uncertain performance of third-party athletes and teams in real-world contests. The Attorney General of California has previously concluded that such contests are unlawful gambling under California law.

185.    Defendants further engage in unfair business practices because its conduct offends

44

established public policy, is immoral and unscrupulous, and causes substantial consumer injury that is not outweighed by any countervailing benefits. California has long prohibited sports wagering due to its addictive nature and destructive impact on families and communities. Defendants exploit consumers by promoting rapid-fire contests, enticing large payouts, and encouraging loss-chasing behaviors, all while ensuring their own profit through the retention of transaction fees.

186. Defendants also engage in fraudulent business practices by misrepresenting the sports betting it offers as legal sports betting, when it is unlicensed and unregulated.

187. Defendants' conduct as alleged herein occurred in the course of trade or commerce.

188. As described herein, Defendants have committed unlawful and unfair business acts or practices in violation of the UCL.

189. As a result of engaging in the conduct alleged in this Complaint, Defendants has also violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, *inter alia*, the following laws:

      a. **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Polymarket's prediction markets

constitute unlawful "gambling games" because they are games "played for currency… or any other thing of value" in which money is staked upon the outcome of uncertain athletic events. Cal. Penal Code § 337j(a)(1). Defendants have not applied for or obtained any state gambling license as statutorily required by California law, and therefore violate California's Gambling Control Act.

b. **California Penal Code § 330a**: Section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Polymarket's platform constitutes such a contrivance: consumers deposit money through the website to stake on athletic outcomes set by the

46

operator, and winnings or losses are determined by the operation of Defendants' software. Defendants' conduct therefore plainly violates Penal Code § 330a.

c. **California Penal Code § 330b**: Section 330b prohibits the manufacture, possession, or operation of "any slot machine or device" that awards money or things of value depending on chance. Polymarket's mobile software functions as a prohibited "device" under this statute. The combination of Polymarket's platform and consumers' mobile devices transforms phones into gambling machines in this context. Indeed, users "deposit" entry fees, the system calculates outcomes based on uncertain sporting events, and the app pays out money or credits to winning users. Defendants therefore violate Penal Code § 330b.

d. **California Penal Code § 337j(a)(1)**: Defendants violate Cal. Penal Code § 337j(a)(1) by "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed sports gambling in California through its platform.

e. **California Penal Code § 337j(a)(2)**: Defendants violate Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Polymarket profits by retaining a guaranteed transaction fee from every wager placed on its platform.

f. **California Penal Code § 319:** Polymarket's platform constitutes a lottery under California law, which defines a lottery as "any scheme for the

47

disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Cal. Penal Code § 319. Every person who "contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor." Cal. Penal Code § 320.

g. **California Penal Code § 337a:** Defendants also violate Cal. Penal Code § 337a, which prohibits pool selling and bookmaking. Under California law, bookmaking includes taking bets on sporting events, and "[t]he taking of one bet is sufficient" to establish a violation. *People v. Thompson*, 206 Cal. App. 2d 734, 739 (Cal. Ct. App. 1962). A "banking game" is one in which the house is a participant that takes on all comers, and a "percentage game" is one in which the house collects a portion of the bets. *Sullivan v. Fox*, 189 Cal. App. 3d 673, 678-79 (Cal. Ct. App. 1987). Polymarket's sports betting platform, which charges transaction fees on every wager, operates as both. California Bus. & Prof. Code § 19801(d) expressly provides that "[n]o person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Defendants have not obtained any license from the State of California to operate a gambling enterprise, and no such license exists for online sports betting in the state.

h. **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the "IGBA"):** The IGBA declares it a crime to "conduct, finance, manage, supervise, direct, or own all of part" of an illegal gambling business.

48

Defendants violate the IGBA because their business involves five or more persons, has been in continuous operation for more than thirty days, and violates California's gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct alleged herein, Defendants squarely violate 18 U.S.C. § 1955.

i. **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) (the "UIGEA"):** The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly accept payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is defined as placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(a). Polymarket knowingly accepts deposits from consumers in California to fund its illegal sportsbook. Because these wagers are unlawful under California law, they also constitute "unlawful Internet gambling" within the meaning of the UIGEA. By accepting consumer payments in connection with these illegal wagers, Defendants violate the UIGEA.

190. Through its unfair and deceptive acts and practices, Defendants improperly obtained money from Plaintiff and members of the Class. As such, Plaintiff respectfully requests that this Court cause Defendants to restore this money to Plaintiff and members of the California

Class, and to enjoin Defendants from continuing to violate the UCL. Otherwise, Plaintiff and members of the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

191.    Accordingly, Plaintiff and the Class lack an adequate remedy at law. Moreover, Plaintiff asserts this cause of action in the alternative to his claims for damages.

192.    As a direct and proximate cause of Defendants' deceptive and unfair trade practices, Plaintiff and other members of Class suffered an injury in fact and/or lost money and property as described above.

193.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff seeks an injunction on behalf of the general public enjoining Defendants from continuing to engage in the conduct described herein as Defendants' wrongful conduct continues to be ongoing.

194.    Plaintiff also seeks rescission and an order requiring Defendants to make full restitution and to disgorge their ill-gotten gains wrongfully obtained from members of the California Class as permitted by Bus. & Prof. Code § 17203.

195.    Additionally, Plaintiff and the Class members seek an order requiring Defendants to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

**SIXTH CAUSE OF ACTION**
**Violation of CLRA, Cal. Civ. Code § 1750,** *et seq.*
**(*On behalf of Plaintiff and the California Class*)**

196.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

197.    Plaintiff brings this cause of action on behalf of himself and the Class.

198.    The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.,* prohibits unfair methods of competition and unfair or deceptive acts or practices

50

undertaken by any person in a transaction intended to result, or which results, in the sale or lease of goods or services to a consumer.

199. Plaintiff and each member of the proposed Class are consumers as defined by Cal. Civ. Code. § 1761(d).

200. Polymarket's online platform and mobile app constitutes a "service" within the meaning of by Cal. Civ. Code. § 1761(b).

201. Defendants violated, and continues to violate, the CLRA by, *inter alia*, misrepresenting the sports betting offered on Polymarket as "legal sports betting," when it is unlicensed and unregulated; representing that its services are legal and permitted in California when they are not; and deceiving or confusing reasonable consumers about the probability of winning their bets, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior.

202. Defendants' wrongful conduct deceives and confuses customers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winning and the obligation to pay for losses), when in fact any such rights, remedies or obligations are prohibited by law.

203. Defendants misrepresented and marketed their platform as a "prediction market" while actually offering illegal sports-betting and/or wagering that are identical to those found in traditional sportsbooks.

204. Defendants' conduct and actions are deceptive, untrue, and misleading to reasonable consumers, and will continue to mislead consumers in the future.

205. Plaintiff and the California Class relied on Defendants' advertisements, representations and/or omissions. Had they known the true nature of Polymarket's platform, they

51

would not have paid Defendants money or used Polymarket.

206.    As a direct and proximate result of Defendants' misconduct, Plaintiff and California Class members have suffered and will continue to suffer actual damages.

207.    Defendants' wrongful conduct is ongoing and presents a continuing threat to Class members.

208.    Moreover, the contracts between Plaintiff and Defendants are void and were void ab initio because the sole purpose of the contracts was to facilitate unlawful gambling activities in California. Under Cal. Civ. Code § 1667, a contract is unlawful where it is: (1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals. Because online sports betting is illegal in California and has been overwhelmingly rejected by California voters, the contracts at issue are void under all three prongs.

209.    Pursuant to § 1782(a) of the CLRA, Plaintiff's counsel has notified or will contemporaneously notify all Defendants in writing by certified mail of its particular violations of § 1770 of the CLRA and demand that it rectifies the problems associated with the actions detailed above, and given notice to all affected consumers of Defendants' intent to act. Should Defendants fail to respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, Plaintiff will seek actual, punitive and statutory damages, as appropriate against Defendants, in addition to injunctive relief, which it currently seeks, under this claim.

**SEVENTH CAUSE OF ACTION**
**Violation of Cal. Civ. Code § 22.2 and the Statute of Anne**
***(On Behalf of Plaintiff and the California Class)***

210.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by

reference as if fully set forth herein.

211.    Plaintiff and the Class Members all lost more than "ten Pounds" during the "playing or betting in the whole, the Sum of Value" within "three Months" as provided within the meaning of Cal. Civ. Code § 22.2, and by extension the Statute of Anne.

212.    Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, Plaintiff is a "Person," as he lost money to Defendants using their gambling services. Defendants received all or part of the money Plaintiff lost to Defendants. Plaintiff has not colluded with any other individuals in bringing this action.

213.    Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, Polymarket is the "winner," as they received all or part of the money lost by Plaintiff and the Class Members using Defendants' gambling services.

214.    One of the statutes of Parliament that was effective in 1850 (and therefore incorporated into California law) was the Gaming Act of 1710, commonly referred to as the "Statute of Anne." A recent binding decision of the Court of Appeal confirms that the Statute of Anne was carried over as part of Civil Code Section 22.2: "California imported not only the whole body of judge-made decisional law of the English courts, but also the written statutes enacted by Parliament. Among the enactments of Parliament adopted as California common law was the Statute of Anne, which declared all gambling debts utterly void, frustrate, and of none effect, to all intents and purposes whatsoever." *Tak Chun Gaming Promotion Co. v. Long*, 96 Cal. App. 5th 1027, 1033 (2023) (cleaned up).

215.    Since 1850, California continues to maintain the Act, and it is currently codified at Cal. Civ. Code § 22.2. Courts have determined that when California imported the English common law, California imported not only the "whole" "body of judge-made" decisional law of the English

courts, but "also the written statutes enacted by Parliament." *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 314 Cal. Rptr. 3d 890, 895 (2023), as modified on denial of reh'g (Nov. 17, 2023) (cleaned up).

216.    On April 13, 1850, California passed an "Act adopting the Common Law," which read: "The Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, shall be the rule of decision in all Courts of this State."

217.    Like many U.S. states, in the early days of statehood, California looked to the English common law as a model for its state law.

218.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
*(On behalf of Plaintiff, the Nationwide Class, the New York Class, the California Class, and the Statute of Anne Multistate Class)*

219.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–129 by reference as if fully set forth herein.

220.    Plaintiff and the Class members have conferred a benefit upon Defendants in the form of the money they wagered on Defendants' illegal sportsbook platform.

221.    Defendants appreciate and have knowledge of the benefits conferred upon it by Plaintiff and the Class.

222.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the Class members, which Defendants has unjustly obtained as a result of their unlawful operation of wagering sports games. As it stands, Defendants have retained millions of dollars in profits generated from Polymarket's unlawful

54

sports betting and should not be permitted to retain those ill-gotten profits.

223. Damages are not equally certain as restitution because the standard that governs restitution is different. A court may award restitution even if damages are insufficiently proven. Unlike damages, restitution is not limited to wrongfully acquired money plus the legal rate of interest; rather, restitution entitles Plaintiff to recover all profits from Defendants' wrongdoing, even where the original funds have grown far greater than the legal rate of interest. These significant differences in proof and certainty establish that a potential legal claim cannot serve as an adequate remedy at law. Plaintiff and the Class lack an adequate remedy at law because the damages suffered by Plaintiff and Class members, if determined to be the amount less than paid to use Polymarket, would leave Plaintiff without a full remedy without equitable restitution.

224. Accordingly, Plaintiff and the Class members seek full disgorgement of all money Defendants has retained as a result of the wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive and declaratory relief as the Court may deem proper; and

9. Awarding treble damages and reasonable attorney's fees pursuant to California Penal Code Section 496(c);

10. Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: March 23, 2026                    Respectfully submitted,

By: */s/ Leanna A. Loginov*
Leanna A. Loginov (NY Bar No. 5894753)
Edwin E. Elliott*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
lloginov@shamisgentile.com
edwine@shamisgentile.com

Omer Kremer *
Gabriel Mandler*
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Tel: (786) 289-9470
omer@edelsberglaw.com
gabriel@edelsberglaw.com

57

*Pro Hac Vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*