## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORENZO MIRO SAN DIEGO and ALEXANDER YOON, individually, and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET, ADVENTURE ONE QSS, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, QC CLEARING, LLC d/b/a POLYMARKET CLEARING, QC TECH LLC d/b/a PM US TECH, and DOES 1-20,<br><br>*Defendants*. | Case No. 1:26-cv-00973-MMG<br><br><br>Hon. Margaret M. Garnett |

### CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Lorenzo Miro San Diego and Alexander Yoon ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby allege the following against Defendants Blockratize, Inc. d/b/a Polymarket, Adventure One QSS, Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, QC Clearing, LLC d/b/a Polymarket Clearing, QC Tech LLC, d/b/a PM US Tech, and Does 1-20 (collectively, "Defendants" or "Polymarket"), based upon, *inter alia*, the investigation made by their counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiffs which are based upon their personal knowledge.

### NATURE OF THE CASE

1. This case arises out of Defendants' operation of an illegal gambling platform

1

throughout the United States.

2.      Defendants own and/or operate Polymarket, one of the most popular and profitable prediction gambling markets on the planet. Polymarket describes its platform (the "Polymarket Platform") as the "World's Largest Prediction Market." In reality, it is an unlicensed sports betting enterprise. Polymarket markets itself as a prediction market, in pertinent part, to hide the fact that the Polymarket Platform provides for and facilitates illegal sports gambling.

3.      Through Polymarket, users wager real-life currency on the outcomes of events, including sports games, individual player metrics, team results, and a combination of outcomes (*i.e.*, parlays). These wagers materially resemble those offered by traditional casinos and sportsbooks, as users may redeem any winnings for real-world currency. While Polymarket purports to offer a legal derivatives exchange and prediction market across the U.S., in reality, its sale of event-based sports wagering contracts (including on the outcome of games, individual player metrics, team results, and sometimes even a combination of sport outcomes, i.e. parlays) violates the specific laws of numerous states that prohibit gambling or expressly allow for the recovery of gambling losses.

4.      Throughout the class period, Polymarket has misled consumers by consistently marketing its platform as safe, legal, and authorized to provide sports gambling.

5.      Through the massive volume of bets and wagers placed on its platform, Polymarket has experienced expedited growth, recently seeking new capital at a valuation of approximately $12 billion.[1]

6.      Multiple states have cracked down on Polymarket and other similar prediction

---

[1] $12 Billion Valuation and an ICE Deal—Is Polymarket About to Go Public? (Nov. 20, 2025) Available at https://finance.yahoo.com/news/12-billion-valuation-ice-deal-144316346.html (last visited June 25, 2026)

market gambling platforms. On January 16, 2026, the Nevada Gaming Control Board sought a declaration and injunction to stop Polymarket from offering what it called "unlicensed wagering in violation of Nevada law."[2] In May, a Nevada judge granted the Gaming Control Board's preliminary injunction prohibiting Polymarket from operating in the state.[3] Similarly, the Tennessee Sports Wagering Council issued a formal cease-and-desist letter to Polymarket on January 9, 2026, ordering Polymarket to stop offering sports event contracts to state residents, refund deposits, and void open contracts in the state.[4]

7.     Multiple state regulators have taken the position that Polymarket's sports-event contracts constitute unlicensed sports wagering, issuing cease-and-desist directives in several jurisdictions. State Attorneys General and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have sent letters to Polymarket's biggest competitor, Kalshi, ordering it to cease and desist its illegal sports betting platform, signaling increased regulatory scrutiny of the entire industry.[5] Minnesota has passed a law outright banning prediction

---

[2] Nevada Gaming Control Board, *NGCB Files Civil Enforcement Action Against Polymarket* (Jan. 20, 2026), https://www.gaming.nv.gov/siteassets/content/about/press-release/ngcb-files-civil-enforcement-action-against-polymarket.pdf (last visited June 25, 2026)

[3] Lindsey Lewis, *Judge blocks Polymarket from operating in Nevada*, 8 News Now (June 3, 2026), https://www.8newsnow.com/news/local-news/judge-blocks-polymarket-from-operating-in-nevada/ (last visited June 19, 2026)

[4] *Tennessee Orders Kalshi, Polymarket and Crypto.com to Cease Sports Betting Contracts*, *Coindesk* (Jan. 10, 2026), available at https://www.coindesk.com/policy/2026/01/10/tennessee-orders-kalshi-polymarket-and-crypto-com-to-cease-sports-betting-contracts (last visited June 25, 2026)

[5] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations (last visited June 25, 2026).

markets like Polymarket from operating in the state.[6]

8.    Further confirming the regulatory concerns that the Polymarket platform propagates, on February 2, 2026, Letitia James, the New York Attorney General, warned consumers of the "significant risks" of participating in Defendants' "unregulated prediction markets," highlighting that "in practice, [prediction markets] operate[s] as unregulated gambling without the basic protections New York consumers both deserve and expect from properly licensed operators[.]"[7]

9.    Virtual gambling is highly addictive and strictly regulated in New York, California, and a multitude of other states. By law, online sports betting can only be offered by licensed operators who abide by numerous rules and regulations designed to protect the public. Polymarket continues to operate its illegal sports betting platform, through its New York headquarters, marketed and made accessible to residents of all states across the country, including those in New York and California.

10.    Through its operation of an unlicensed sports-betting platform, Polymarket has violated applicable state anti-gambling laws, engaged in deceptive practices, and unjustly enriched itself at the expense of consumers in the United States, including New York and California.

11.    And based on Polymarket's false representations, Plaintiffs and the Classes (as defined below) bargained for entry into legal derivatives exchange and prediction markets. But

---

[6] Ryan Luetkemeyer, *Polymarket follows Kalshi, Trump in suit against Minnesota's prediction market ban*, Courthouse News Serv. (June 4, 2026), https://www.courthousenews.com/polymarket-follows-kalshi-trump-in-suit-against-minnesotas-prediction-market-ban/ (last visited June 17, 2026)

[7] Alex Sherman, *New York AG issues warning around prediction markets ahead of Super Bowl*, CNBC, Feb. 2, 2026, https://www.cnbc.com/2026/02/02/new-york-ag-prediction-markets-super-bowl-warning.html (last visited June 25, 2026)

instead, they received entry into illegal sports gambling contests. Plaintiffs and the Classes did not receive the benefit of their bargain, as the illegal entries had substantially less (in fact zero) value than entry into legal contests. Moreover, if Polymarket had accurately disclosed the unlawful nature of the gambling services, Plaintiffs and the Classes would not have used the Polymarket Platform's sports gambling services.

12.     Plaintiffs, individually and on behalf of all others similarly situated, seek all available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

## PARTIES

13.     At all times material hereto, Plaintiff San Diego has been and is a citizen of, and domiciled in, San Mateo, California.

14.     At all times material hereto, Plaintiff Yoon has been and is a citizen of, and domiciled in, Rancho Palos Verdes, California.

15.     Defendant Blockratize, Inc. d/b/a Polymarket is a corporation incorporated in Delaware and headquartered in New York, New York. Therefore, Defendant is considered a citizen of New York and Delaware for purposes of diversity pursuant to 28 U.S.C. § 1332(d)(2). Blockratize is the sole owner of QCX LLC, QC Clearing, LLC, and QC Tech LLC, and has operated Polymarket from New York since its inception in 2020. Blockratize is believed to conduct substantial business across the United States, including in this District, and derives substantial revenue from those operations. On January 27, 2026, Blockratize filed a U.S. trademark application for Polymarket.[8]

---

[8] https://www.trademarkelite.com/trademark/trademark-detail/99617077/POLYMARKET? (last visited June 25, 2026)

16. Defendant Adventure One QSS, Inc. d/b/a Polymarket is a corporation organized under the laws of Panama with its headquarters and principal place of business at 1280 Lexington Avenue, New York, New York 10028. Defendant is a citizen of New York and Panama for purposes of diversity pursuant to 28 U.S.C. § 1332(d)(2). Defendant owns and/or operates Polymarket and conducts substantial business in the United States, including in this District, to derive substantial revenue from those operations.

17. Defendants QCX LLC (d/b/a "Polymarket US"), QC Clearing LLC (d/b/a "Polymarket Clearing") (collectively "QCEX"), and QC Tech LLC (d/b/a "PM US Tech") comprise Blockratize's American event-based prediction market and clearinghouse, and each are limited liability companies organized under the laws of Delaware. QCEX was purchased by Defendant Blockratize in July 2025 for the purpose of restarting Blockratize's gambling operations in the United States.[9] QCEX is believed to conduct substantial business across the United States, including in this District, and to derive substantial revenue from those operations, and are operationally directed and controlled by Blockratize personnel located in New York, New York.

18. Blockratize, Inc. is the sole member of QCX LLC, QC Clearing LLC, and QC Tech LLC. Because Blockratize, Inc. is a citizen of New York and Delaware, QCX LLC, QC Clearing LLC, and QC Tech LLC are each therefore citizens of New York and Delaware for purposes of diversity jurisdiction.

19. Defendant Does 1-20 are individuals and/or entities who facilitate Defendants'

---

[9] Amin Ayan, *Polymarket Acquires Derivatives Exchange QCEX for $112M to Expand US Footprint*, Cryptonews.com, https://cryptonews.com/news/polymarket-acquires-derivatives-exchange-qcex-for-112m-to-expand-us-footprint/ (last visited June 19, 2026).

unlawful practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiffs. The Doe defendants, and the Polymarket entities, are collectively referred to in this Complaint as "Defendants" or "Polymarket." Plaintiffs expressly reserve the right to amend this Complaint to add the Doe defendants by name, once their identities are known.

20.    Each Defendant is a "person" and/or engages in "business" and has transacted business within this District by offering, marketing, facilitating, and profiting from purported event-contract products to consumers residing in and/or accessing the platforms within this state and across the country.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because: (i) Plaintiffs (and at least one member of the Class) are citizens of a different state than Defendants; (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and (iii) none of the exceptions under that subsection apply to this action.

22.    This Court has general personal jurisdiction over Defendants Blockratize, Inc. and Adventure One QSS, Inc. because they maintain their principal place of business and operational headquarters in New York, New York, and because Defendants regularly conduct business within this District. Defendants' executive leadership, corporate decision-making, and core operational functions are directed and controlled from this District. Accordingly, these Defendants are "at home" in New York.

23.    This Court also has general personal jurisdiction over Defendants QCX LLC, QC Clearing LLC, and QC Tech LLC. Although these entities are organized under Delaware law, they are wholly owned and controlled by Blockratize, Inc., which directs their operations from New York. Blockratize, Inc. is the sole member of each LLC, and accordingly, for purposes of personal

jurisdiction, these LLCs share the citizenship and forum contacts of their sole member. Moreover, upon information and belief, key operational decisions for these entities—including decisions regarding platform functionality, compliance, user agreements, and marketing—are made by Blockratize personnel located in New York.

24.     This Court also has specific personal jurisdiction over Defendants because Plaintiffs' claims arise out of and relate to Defendants' purposeful activities directed from New York. Defendants designed, developed, operated, and controlled the Polymarket platform, its policies, payment systems, and the challenged practices at issue from their New York headquarters. The misconduct alleged herein emanated from decisions and conduct occurring in this District. Upon information and belief, Defendants' marketing campaigns, including advertisements promoting purportedly lawful wagering nationwide and to Plaintiffs, were directed from this District. Plaintiffs' injuries are directly traceable to these New York-based decisions and conduct.

25.     Defendants purposefully availed themselves of the privilege of conducting business in New York market by maintaining their corporate headquarters in this District, employing personnel here, directing platform operations from this District, engaging in continuous and systematic business activities here, and intentionally causing effects within and outside New York, including to Plaintiffs. Defendants offer Polymarket in New York and to consumers nationwide, including Plaintiffs.

26.     Moreover, Defendants actively disseminate targeted marketing and advertisements within the state with the intent of promoting and selling its product and service to consumers in this District. As such, Defendants conduct business with sufficient minimum contacts in New York, and/or otherwise intentionally avail themselves of the New York market.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants

reside in this District within the meaning of 28 U.S.C. § 1391(c), and the remaining entity Defendants-QCX LLC, QC Clearing LLC, and QC Tech LLC-are subject to personal jurisdiction in this District and therefore also reside here for venue purposes.

28. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants' operations emanate from this District and involve commerce that flows to and from this District. Thus, a substantial part of the events or omissions giving rise to the claims occurred in this District.

29. The amount in controversy exceeds the jurisdictional minimum of this Court.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I. *The Problem of Online Gambling*

30. Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including prediction markets.

31. Since the Supreme Court's 2018 decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[10] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[11]

32. Approximately 2.5 million adults in the U.S. suffer from severe gambling problems,

---

[10] Mika Ono, *Study Reveals Surge in Gambling Addiction Following Legalization of Sports Betting*, UC San Diego Today, Feb. 17, 2025 https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed June 25, 2026).

[11] *See id*.

while an additional five to eight million experience significant issues.[12] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[13]

33.    Between 2018 and 2021, the National Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[14]

34.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[15]

35.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[16] Online platforms, including sportsbooks, have been identified as significant

---

[12] Clea Simon, *Gambling problems are mushrooming. Panel says we need to act now*, The Harvard Gazette, https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/ (last visited June 25, 2026).

[13] Joakim Hellumbraten Kristense, Stale Pallesen, Jonas Bauer, Tony Leino, Mark D. Griffiths, Eilin K. Erevik, *Suicidality Among Individuals With Gambling Problems: A Meta-Analytic Literature* Review, Psychological Bulletin, Jan. 2024, https://psycnet.apa.org/fulltext/2024-35228-001.html (last visited June 19, 2026).

[14] Cait Huble, *NCPG Statement on the Betting on Our Future Act*, National Counsel on Problem Gambling, Feb. 10, 2023, https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed June 25, 2026).

[15] *See supra* n. 11.

[16] Wayne Parry, *Poll shows young men in the US are more at risk for gambling addiction than the general population*, Associated Press, Sept. 20, 2024, https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15  (last visited June 19, 2026).

contributors to this trend. These platforms often employ addictive design features to keep users engaged.

36.    The problem extends to minors as well. Studies indicate that 36% of boys aged 11 to 17 have gambled in the past year, and 60% of children in that age range have seen gambling advertisements on social media.[17] Mobile gaming companies' tactics, driven by sophisticated machine learning models, are highly effective at capturing attention but also exploit individuals with addictive tendencies by encouraging continued or escalated gambling.

37.    The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM 5-TR) classifies gambling disorder as the only defined behavioral addiction in the manual.[18] Symptoms include the need to gamble with increasing amounts of money to achieve the desired excitement, being restless or irritable when attempting to cut down or stop gambling, repeated unsuccessful efforts to control, cut back, or stop gambling, and lying to family members, a therapist, or others to conceal the extent of involvement with gambling.

38.    The rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. According to a review by the National Council on Problem Gambling ("NCPG"), the rate of problems is even higher among those who bet on sports online: 16% met clinical criteria for gambling disorder and another 13% showed some signs of problematic

---

[17] Sequoia Carrillo, *More teens are getting hooked on gambling. Parents say it often goes undetected*, NPR, April 5, 2026, https://www.npr.org/2026/04/05/nx-s1-5762276/teens-getting-hooked-on-gambling-sports-betting (last visited June 19, 2026).

[18] American Psychiatric Association, *Substance-Related and Addictive Disorders*, https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Substance-Use-Disorder.pdf (last visited June 19, 2026).

gambling behavior.[19]

39.    Research from MIT Sloan has documented that the legalization and expansion of sports betting leads to higher credit card balances, reduced available credit, decreased net investments, and greater lottery participation, with these effects being particularly pronounced among financially constrained households.[20] Legalized sports betting is also associated with statistically significant declines in credit scores, a 25 to 30 percent increase in bankruptcies, and an 8 percent increase in debts being transferred to collectors.[21] Notably, states that permitted online gambling experienced close to three times the decline in credit scores as states that allowed gambling but not online betting, and also experienced increased auto loan delinquencies and debt consolidation loan use.

40.    The harms of sports betting extend beyond financial injury. Research has documented that legalized sports betting amplifies intimate partner violence when a home team unexpectedly loses.[22] Gambling disorder carries the highest suicide rate of any addiction disorder, with one in five individuals having attempted suicide.[23] The pressures that sports betting puts on college athletes may also be a contributing factor to the rise in suicidality for this group.

---

[19] National Council on Problem Gambling, *A Review of Sports Wagering & Gambling Addiction Studies Executive Summary*, https://www.ncpgambling.org/wp-content/uploads/2023/09/Sports-gambling_NCPGLitRvwExecSummary.pdf (last visited June 19, 2026).

[20]Scott R. Baker, Justin Balthrop, Mark J. Johnson, Jason Kotter, Kevin Pisciotta, *Gambling Away Stability: Sports Betting's Impact on Vulnerable Households*, https://mitsloan.mit.edu/sites/default/files/inline-files/Session3_Paper3_Gambling%20Away%20Stability.pdf  (last visited June 25, 2026)

[21] *Id.*

[22] Kyutaro Matsuzawa, Emily Arnesen, *Sports Betting Legalization Amplifies Emotional Cues & Intimate Partner Violence*, *Sports*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4938642 (last visited June 25, 2026)

[23] *Id.*

41.    The addiction and fallout related to sports betting is therefore not strictly limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains wholly insufficient, meaning that the vulnerable populations that gambling exploits will likely never get the treatment they desperately need.

42.    Despite these harms, online gambling companies like Polymarket exploit vulnerable consumers through "[s]ystems of rewards and punishments in online gambling products [that] are designed to encourage continued use and attention, additional payments, or other behaviors that are not always beneficial to the user[.]"[24] This often takes the form of push notifications to users' phones or promotions such as "free" bets or sweepstakes entries or limited time increased payments to encourage users to continue to gamble.[25]

## II.    *State Law Governs Sports Betting like the Polymarket Platform*

### A.    **New York law prohibits unlicensed wagering and sports gambling**

43.    In *Murphy,* the Supreme Court confirmed that states, not the federal government, may regulate sports betting.

---

[24] Gainsbury, *et al.*, *Reducing Internet Gambling Harms Using Behavioral Science: A Stakeholder Framework.* Front. Psychiatry 11:598589 (2020) (noting that mobile gaming companies' tactics, driven by sophisticated machine learning models, are highly effective at capturing attention but may also exploit individuals with addictive tendencies by encouraging continued or escalated gambling. The authors advise that these targeted mechanisms must be carefully managed and regulated, as they pose a substantial risk when not balanced with protective measures).

[25] A recent Wall Street Journal investigation reported that Polymarket sponsored and amplified videos depicting users earning substantial profits from bets, including fabricated winning wagers, thereby creating the impression that gambling regularly yields significant returns and encouraging continued wagering activity. *See* Wall Street Journal, *They Looked Like They Were Getting Rich on Polymarket—But None of It Was Rea*l (June 2026), accessible at: https://www.wsj.com/business/media/polymarket-social-media-bets-prediction-market-441cdeb5 (last accessed June 25, 2026).

44.     Since then, more than 40 states and territories have enacted legislative and regulatory schemes that both permit licensed sports betting and prohibit the operation of gambling enterprises that violate state regulations, such as by failing to register with the state.

45.     New York, for instance, where Polymarket's operations are based, generally prohibits all commercial gambling, with limited exceptions. *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's strong public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759, 636 N.Y.S.2d 950 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling.").

46.     Courts have confirmed that virtual casinos and online gambling operations are subject to New York's gambling prohibitions. *See People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N.Y. Cty. 1999) (holding that an online gambling operation accessible in New York violated New York gambling laws).

47.     In New York, gambling occurs when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).[26] Both in person and virtual casinos are subject to these laws. *See e.g.*, *People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N.Y. Cty. 1999).

48.     New York's statutory definition of "something of value" is expansive and includes: any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of

---

[26] The Penal Law imposes no criminal liability on individual bettors, focusing instead on bookmakers and other operations, like Defendants, that advance or profit from illegal gambling activity. *See, e.g.*, N.Y. Penal Law § 225.10.

any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge. N.Y. Penal Law § 225.00(6).

49.    Moreover, in New York, legal gambling operations are governed by the New York Racing, Pari-Mutuel Wagering and Breeding Law. N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 100 *et seq* ("PML"). Sports wagering is regulated in PML §§ 1367 and 1367-a. Section 1367-a(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission."

50.    New York law defines "Sports wagering" as: "[w]agering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or any combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through Internet websites accessed via a mobile device or computer, and mobile device applications; provided, however, that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line bets, pools, in-game wagering, in-play bets, proposition bets, and straight bets." PML § 1367(x).

51.    Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401.

52.    New York also generally prohibits deceptive acts and practices, including false advertisements. *See* New York General Business Law Section 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in

15

this state are hereby declared unlawful") and 350 ("false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

53.    Defendants blatantly disregard New York's clear prohibition on gambling. As discussed further below, the Polymarket platform allows users to place bets on the outcome of sports games, individual player metrics, team results, and/or a combination (*i.e.* parlays). These bets materially resemble those offered at traditional casinos or sportsbooks.

54.    Indeed, a user that wagers on Defendants' platform is "stak[ing] or risk[ing] something of value"—real-world currency—"upon the outcome of … a future contingent event not under his control"—the results and outcomes of sports games—"upon an agreement or understanding that he will receive something of value in the event of a certain outcome"—namely, real-world currency, should the wagered-upon outcomes of the sports event come to fruition. Thus, Polymarket's gambling sportsbook falls squarely within the ambit of New York's anti-gambling laws.

55.    On October 24, 2025, the New York State Gaming Commission sent Kalshi, Inc.— a direct competitor of Polymarket offering virtually identical sports gambling enterprise concealed under the guise of a "predictions market"—a cease-and-desist letter and warned that offering sports gaming in New York "in connection with any sports event" under its racing laws empowers it to "levy and collect civil penalties and fines for any violation of the Racing Law."[27] New York regulators have also taken action against Coinbase and Gemini for operating competitor gambling operations under the guise of prediction markets.

56.    Polymarket is equally subject to the same regulatory requirements and potential

---

[27] *See* https://finance.yahoo.com/news/york-state-latest-sued-kalshi-200937270.html; *see also* https://nexteventhorizon.substack.com/p/kalshi-sues-new-york  (last visited June 25, 2026).

civil penalties for similarly operating unlawfully in New York.

**B.      California broadly prohibits sports betting**

57.      For over 150 years, California has broadly prohibited commercialized gambling.

58.      For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

59.      A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants but is not directly involved in game play. *See id. at* 679.

60.      Similarly, California Penal Code Section 337a prohibits additional conduct, including:

a.      "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added);

b.      *"[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money . . . staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever*." *Id.* at (a)(3) (emphasis added);

17

c.    "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(4) (emphasis added); and

d.    "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus.*" *Id.* at (a)(6) (emphasis added).

61.    The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

62.    Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest." CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE §

18

337a(a)(3)) (cleaned up).[28]

63.     "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC,* 2017 WL 11634526, at \*8 (C.D. Cal. May 15, 2017).

64.     Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

65.     For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[29] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor."[30] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

66.     Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other

---

[28] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited June 25, 2026).

[29] CAL. PENAL CODE § 320.

[30] CAL. PENAL CODE § 321.

valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

67.    And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having first procured . . . all federal, state, and local licenses required by law*."  CAL. PENAL CODE § 337j. (emphasis added).

68.     In fact, as the California legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

69.    California voters have overwhelmingly rejected the legalization of online sports betting. In 2022, California voters rejected Proposition 26, a Native American tribe-sponsored ballot initiative that would have legalized in-person sports betting at tribal casinos, by a margin of 67% to 33%. That same year, California voters rejected Proposition 27—an online sports betting industry-sponsored ballot initiative that would have legalized online sports betting—by a margin of 82% to 18%, one of the largest margins of defeat in California ballot proposition history. It was touted that the sports betting industry reportedly spent $150 million on political advertisements in support of Proposition 27.[31] Despite this resounding rejection of online sports betting, Polymarket has nonetheless chosen to offer its illegal sports betting platform to California consumers.

70.    Most recently, the California Attorney General confirmed that sports betting violates California law. In a July 2025 opinion, the California Attorney General issued an

---

[31] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting*, WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last accessed June 25, 2026).

20

interpretive opinion stating that "**California law prohibits the operation of daily fantasy sports games . . . Such games constitute wagering on sports in violation of Penal Code section 337a.**" (emphasis added) *See* Opinion of the California Attorney General No. 23-1001, https://oag.ca.gov/system/files/attachments/press-docs/23-1001.pdf (last visited June 17, 2026).

71.     California also historically allowed the recovery of gambling losses through its ancient Statute of Anne.

72.     In 1710, the Parliament of the United Kingdom passed the Gaming Act of 1710 ("Gaming Act"). The Gaming Act did two important things. First, Section One of the Gaming Act voided and outlawed all contracts relating to gambling contracts to extend money or credit to those gambling and outlawed their recovery. Second, Section Two of the Gaming Act specifically allowed those who lost money gambling to bring suit for losses incurred within the prior three months from the winners of that money. Section Two of the Gaming Act—commonly referred to as the Statute of Anne—was carried over from the United Kingdom in many states in the form of gambling loss recovery statutes and other incorporations of English law into state law.

73.     California was one of those states. Cal. Civ. Code § 22.2. Specifically, in 1850, California enacted a statute that the "[t]he common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of the state." That enactment remains the law of California, and is currently codified at Civil Code § 22.2.

74.     A recent binding decision of the Court of Appeal confirms that the Statute of Anne was carried over as part of Civil Code Section 22.2: "California imported not only the whole body of judge-made decisional law of the English courts, but also the written statutes enacted by Parliament. Among the enactments of Parliament adopted as California common law was the

21

Statute of Anne, which declared all gambling debts utterly void, frustrate, and of none effect, to all intents and purposes whatsoever. (9 Anne, ch. 14, § 1.)" *Tak Chun Gaming Promotion Co. v. Long*, 96 Cal. App. 5th 1027, 1033 (2023) (cleaned up).

75.    Accordingly, in California, all gambling losses that exceed £10.00—approximately $13.64 at the exchange rate on January 24, 2026—are recoverable as a matter of right in California.

**C.    Other states authorize the recovery of gambling losses through Statute of Anne laws**

76.    Numerous other states and jurisdictions authorize the recovery of gambling losses through their respective versions of the Statute of Anne. There are generally two such categories: jurisdictions that permit sports betting but allow the recovery of gambling losses, and those that do not permit sports betting but still allow recovery of gambling losses.

77.    In addition to New York, the following jurisdictions permit at least some sports gambling but maintain statutes allowing recovery of gambling losses or voiding of wagers, or permit recovery of gambling losses when gambling was not lawful or otherwise authorized where legal gambling could be lawful or could otherwise be authorized: Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1-2); Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Maryland (Md. Code Ann., Crim. Law § 12-110), Michigan (Mich. Comp. Laws §§ 750.315(1), 600.2939(1)), Mississippi (Miss. Code Ann. § 87-1-5 (except as to certain counties and on certain boats), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9

Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), and West Virginia (W. Va. Code § 55-9-2).

78.    In addition to California, sports gambling remains unlawful in the following jurisdictions (except in certain states where it is legal on Native American reservations only). In these jurisdictions, consumers may still seek recovery for gambling losses: Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.20), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.740), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. § 895.056).

79.    Collectively, these states are referred to herein as the "Statute of Anne States."

III.    *Defendants Use a "Prediction Market" as a Pretext for Real, Online Sports Gambling.*

80.    Polymarket operates through its Platform which is comprised of both a website and mobile application.

81.    Polymarket promotes its product as a "prediction market," which enables the purchase and sale of "event contracts." Event Contracts are defined as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency [] other than a change in the price, rate, value or levels of a commodity." 7 U.S.C. § 7a-2(c)(45)(C)(i). Accordingly, payment under an event contract is contingent upon whether a specified future event occurs.

82.    At its essence, Polymarket offers binary event contracts that pay out based on whether a specified future event occurred—meaning that users may bet "yes" or "no" on whether an event at issue comes to fruition. Polymarket attempts to differentiate its platform from traditional gambling by claiming that its "prediction market" is equivalent to owning a share with an economic hedging function and that Polymarket derives revenue solely from transaction fees

rather than from customer losses.[32]

83.     The logistics of each wager are simple. First, a user selects a market (colloquially known as a "polymarket"). Second, the user bets "Yes" or "No"—as Polymarket instructs users to "[p]lace a bet"—buying and odds shift in real time as other users bet. Users can fund their wagers using crypto, credit or debit card, or bank transfer, and, upon information and belief, there are no bet limits. Third, the user can sell their Yes or No shares at any time, or wait until the market ends to redeem winning shares for $1 each. Polymarket makes money by raking in a fee on each transaction and also charges a separate fee for certain deposit and withdrawal methods.

84.     In essence, Polymarket matches bettors on opposite sides of the event contract so that the combined wager from both bettors equals $1.00. If the price changes, bettors may "sell" their wager to other bettors before the event takes place. In fact, the Platform tells users they can "[c]reate an account and place [their] first trade in minutes."

85.     Accordingly, the use of the term "event contract" is merely an attempt to disguise Polymarket's provision of unlawful gambling and sports betting. Whether characterized as "shares," "contracts," or "bets," the fundamental economic reality is the same: users wager real money on the outcome of sporting events in the hopes of financial gain. That is textbook sports gambling.

86.     As part of its relaunch into the United States, Polymarket has now deliberately restructured its platform to enable illegal sports betting while disguising those wagers as event contracts. This shift constitutes a fundamental overhaul of Polymarket's business model, designed

---

[32] Anderson Cooper, Aliza Chasan, Graham Messick, Alex Ortiz, *Polymarket CEO says his prediction market is 'the most accurate thing we have as mankind right now"*, https://www.cbsnews.com/news/polymarket-predictions-accuracy-shayne-coplan-60-minutes/ (last visited June 25, 2026).

to draw users from all 50 states into unlawful sports betting on its platform despite the absence of required state licensure and regulatory oversight.

87.     Unregulated sports betting is illegal in New York, California, and numerous other states. In such betting, consumers wager on the performance of athletes or teams in a sporting event, through the establishment of betting lines. Consumers then proceed to place bets on either side, wagering on opposite ends of whether an event occurs or not.

88.     The options available on Polymarket replicate those on a licensed sportsbook, demonstrating that consumers on Polymarket are participating in wagering structures indistinguishable from traditional sportsbooks. Here is an example of the offerings on Polymarket, demonstrating that the platform is virtually indistinguishable from that of a traditional sportsbook:




89.    Polymarket's Platform is designed to encourage high-risk transactions by emphasizing reward while obscuring risk. These features directly incentivize repeated transactions by gamifying participation and encouraging rapid and repeated wagering, mirroring the behavioral hooks commonly used by digital gambling platforms. In fact, the volume of sports wagers on Polymarket's platform vastly exceeds those placed by users on other event types, with sports wagering achieving the highest platform velocity of all sectors offered on the Platform.

90.    According to Polymarket, "buying shares is like betting on the outcome. Odds shift in real time as other traders bet."



91.    Polymarket even calls the process of placing a bet on Polymarket "Plac[ing] a bet" and tells consumers that there are no "bet limits":



92. In addition to collecting the value of incorrect bets placed, Polymarket makes money by raking in a fee on each transaction made on the platform.

93. Bettors deposit funds into their Polymarket account and use those funds to place bets. Any return on a successful wager will remain in the bettor's Polymarket account until they choose to withdraw. Polymarket charges a fee for certain deposit and withdrawal methods.

94. Polymarket matches bettors on opposite sides of the event contract (the "yes" and the "no") so that the combined wager from both bettors equals $1.

## 3. Profit 🤑

Sell your 'Yes' or 'No' shares at any time, or wait until the
market ends to redeem winning shares for $1 each.
Create an account and place your first trade in minutes.

**Get Started**

95. If the price changes, bettors may "sell" their wager to other bettors before the event takes place.

96. Polymarket employs classic sports-betting categories: money line winner markets, spreads, totals, props and parlays. These terms do not exist independent of the sports betting industry and relate to nothing except variations of ways to hedge or bet risk on sporting events, pending the outcome of entirely independent events that relate to nothing paid or exchanged in return for monetary value. Indeed, Polymarket "shares" and "event contracts" for sports wagers constitute gambling.

97. To further spur gambler engagement, Polymarket offers a continuously updating ticker tape of market activity, a "people are also buying" feed on its event contract wager page

seen by gamblers before placing a wager, and a "people also bought" prompt shown immediately after users place a wager. Each of these features sustains gamblers' real-time stimulation and encourages the gambler to immediately place another wager without pause. These features mirror known psychological triggers of gambling behavior and are engineered to increase user retention and transaction volume.

98.    This uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms, modeled after operant conditioning and slot machine dynamics, can bypass rational evaluation and contribute to excessive financial risk-taking.

99.    Polymarket also utilizes competitive and social comparison metrics to encourage betting, including public leaderboards to rank its bettors based on profits and volume on a daily, weekly, monthly, and all-time basis.  The leaderboards serve no market purpose; instead, they promote repeated high-risk behavior by rewarding speculative successes with community recognition.

100.    The leaderboard rankings, displayed with usernames, avatars, and performance stats, mimic leaderboards utilized in video games and other platforms such as fantasy contests and social casinos, and encourage users to chase short-term gains.

101.    There is also a countdown clock in the top right corner appearing in blue that reflects the remaining time for the time-limited leaderboards, as well as a button to "Join" either the profit or volume leaderboards, respectively. These features only serve to instill further incentive and pressure for users to appear on the leaderboard.

102.    User profiles serve as performance dashboards that encourage bettors to compete, compare, and signal success. The interface reinforces speculative behavior through design choices

modeled on gambling platforms, including rapid trade cycling, reward anticipation, and mechanisms known to trigger compulsive engagement loops.

IV. *Polymarket Falsely Advertises its Platform as Legal and Deceives Consumers into Believing its Sportsbook Platform is Legal*

103.    Polymarket deliberately markets its sportsbook as a legal events platform to induce consumers to use its services. The company employs bold slogans and prominent fonts to create the impression of legality, even though its platform constitutes unlawful sports betting in violation of multiple state gambling laws.

104.    Polymarket advertises its sportsbook through various different mediums, including social media, as previously shown above.

105.    Knowingly, Polymarket continuously and intentionally promotes its platform as providing legal access to sports betting. Consumers relying on these representations are deceived into believing their wagers are lawful, when in reality, they are participating in Defendants' illegal sports betting enterprise.

106.    Despite Polymarket repeatedly marketing its platform as offering legal sports betting, in truth, it serves as an unlicensed sportsbook, mirroring the betting structures found in regulated casinos. The platform is unlawful, and consumers are tricked into wagering just like they would at a traditional sportsbook, only without the oversight and protections that legitimate sportsbooks provide.

107.    As part of its marketing push, upon information and belief, Polymarket regularly purchases advertisements on numerous social media platforms, including Facebook and Instagram, to specifically target states that have not legalized sports betting, including California.

108.    Examples of Polymarket's deceptive advertising include Meta advertisements with

29

taglines such as: "**BREAKING: Legal football trading is coming to ALL 50 states this fall**"; "You've seen the takes. Now you can trade them legally in all 50 states. Download Polymarket now"; and "Trade sports live like stocks. No house edge, lowest fees, and legal in every state. Download today for a $10 bonus – no deposit required." These advertisements are deliberately designed to induce consumers to believe that Polymarket's sports betting platform is legal throughout the United States when, in fact, it is not.

109.    In addition, Polymarket also targets other states where sports gambling is illegal by reposting text messages promoting the legality of sports betting, including but not limited to Georgia and many others.[33]

110.    Indeed, Polymarket promotes its sports-betting market as a lawful alternative to traditional sportsbooks. Shayne Coplan, Polymarket's founder and chief executive officer, proclaimed that "[u]nlike a betting site where you make a bet and it's against the house, here you own a share. You could almost say it's similar to a stock, but it's not a stock."[34]

111.    Polymarket openly markets that sports trading on its platform may be accessed in all 50 states. Here is an example of Polymarket's official X account (formerly known as Twitter) inviting users from all 50 states to bet (referred to as "trading") on football games through its platform:

---

[33] Adam Roarty, *Polymarket Ads Target States With No Sports Betting, Signal US Relaunch for Football Season,* Castiobeat.com, Aug. 22, 2025, https://casinobeats.com/2025/08/22/polymarket-ads-target-states-with-no-sports-betting-signal-u-s-relaunch-for-football-season/ (last accessed June 25, 2026).

[34] *See supra* n. 33.



112.    Taking things a step further, Polymarket operates an Instagram account with hundreds of thousands of followers that is exclusively tailored to its sports gambling enterprise:



113.    Making matters worse, Polymarket runs advertisements that explicitly liken its sports betting operations to trading "stocks," but admits it provides "odds," continuing to purport its legality in every state despite not obtaining necessary licensure.

114.    Compounding its mockery of state anti-gambling laws, Polymarket openly flaunts the true purpose of its supposed restructure in its marketing, making clear that it allows sports

betting only on football "for now"—a transparent signal of its calculated plan to expand such offerings in the future.





115.     As demonstrated above, Polymarket has expressly repositioned itself as a nationwide sportsbook (at least for now), open to users in all 50 states, while consciously operating without the state licensure required to offer sports betting. In so doing, Polymarket knowingly and blatantly defies applicable state anti-gambling laws.

116.     As of September 2025, Polymarket's operations had evolved further into illegal sports gambling, offering categories strikingly similar to those in traditional sportsbooks, including point spreads, over/unders, player props, and at times, same-game parlays.

117.     Polymarket made the foregoing false statements concerning the legality of its services even though unlicensed sports wagering is prohibited in every state, and sportsbook operating that is licensed is heavily regulated at the state level when permitted. Yet, in many of its marketing materials, Polymarket admits it offers gambling services.

118.    For example, in the United States, Polymarket Sports sponsored an advertisement on Meta, which started running January 30, 2026, stating "You've seen the takes. Now you can trade them legally in all 50 states. Download Polymarket now."



119.    In another advertisement run on Meta, Polymarket stated "Trade sports live like stocks. No house edge, lowest fees, and legal in every state. Download today for a $10 bonus – no deposit required."[35]

---

[35]https://www.facebook.com/ads/library/?active_status=active&ad_type=all&country=US&is_ta rgeted_country=false&media_type=all&q=polymarket&search_type=keyword_unordered&sort_ data[mode]=total_impressions&sort_data[direction]=desc



120.    Polymarket's Instagram advertisements evidence Polymarket's strategy to operate and market like a gambling entity rather than a risk prediction market. Polymarket has adopted this strategy, despite its knowledge that it has not registered to offer gambling services in the states where those services are legal and the fact that it intentionally targets states where gambling remains illegal.

121.    On its website, Polymarket repeatedly assures prospective and existing customers that sports betting is now legal in all 50 states.

122.    In December 2025, Polymarket began claiming that "Polymarket operates globally through separate legal entities. Polymarket US is operated by QCX LLC, d/b/a Polymarket US, a CFTC regulated Designated Contract Market. This international platform is not regulated by the

CFTC and operates independently."

123.    Polymarket's registration with the Commodity Futures Trading Commission does not authorize it to offer legal sports gambling to its customers in all fifty states. Polymarket's promises to consumers that its sports gambling is legal are misleading.

124.    Polymarket also misleads consumers by linking to the August 26th, 2025 Terms of Use Policies, which explicitly exclude US users, for example:

> USE OF THE SITE, PLATFORM OR TECHNOLOGY FEATURES FOR TRADING IS NOT PERMITTED BY PERSONS OR ENTITIES WHO RESIDE IN, ARE LOCATED IN, ARE INCORPORATED IN, HAVE A REGISTERED OFFICE IN, OR HAVE THEIR PRINCIPAL PLACE OF BUSINESS IN THE UNITED STATES OF AMERICA.[36]

125.    Buried within Polymarket's website, which is only accessible through research analysis, is the "POLYMARKET APP – TERMS & CONDITIONS (ISV FRONT END)", which appears to apply between US Polymarket users and PM US Tech (a/k/a QC Tech Limited Liability Company).[37]

---

[36]    Polymarket    August    26,    2025    Terms    of    Service, https://web.archive.org/web/20250827131938/https://polymarket.com/tos (last visited June 19, 2026).

[37] https://polymarket.us/tos

126. Once potential customers of Polymarket's gambling services reach Polymarket's Application download page, Polymarket incorrectly states that Polymarket "is now fully legal in the United States – in all 50 states".

With over 30 million users globally, Americans can now trade on the World's Largest Prediction Market™

On Polymarket, you can buy in and trade out without ever getting locked out.

Polymarket always has the tightest spreads, the lowest fees, & the biggest opportunities.

LIVE SPORTS TRADING
- Live trading in game
- Instantaneously trade in and out
- Bigger payouts than sportsbooks
- No "house" & no limits

TRADE ON ANYTHING
- COMING SOON: Geopolitics, election, news, tech, & culture polymarkets
- Put your money where your mouth is, and earn a return for your knowledge

HOW DOES IT WORK?
- Prices = probability
- If something has a 67% chance of happening, you can buy shares for $0.67 each which you can sell if the price goes up — or cash in for $1 each if you're right
- If you think the odds are wrong, you can profit by buying shares in the polymarket

LEGAL & REGULATED
- Polymarket is now fully legal in the United States — in all 50 states
- Backed by the New York Stock Exchange's parent company
- Bank-grade security & encryption
- 24/7 live customer support

Join the tens of millions of Polymarket users & see why there's been over $27 billion traded globally.

You see the future — now trade it.

## V. *Defendants Enable Unlawful Gambling in New York Without Statutory Consumer Protections*

127. The harm caused by Polymarket's illegal gambling operation is further exacerbated by its lack of accountability and regulatory oversight. Unlike licensed casinos and sportsbooks, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

128. Polymarket provides no safeguards to prevent widespread addiction, financial ruin or risk of loss, or provide education to users that supposed "event contracts" constitute a form of highly addictive gambling. Polymarket allows anyone to open an account and start placing bets, after entering basic personal information, so long as the individual is at least 18 years old and can provide a single verifying document.

129. Polymarket also did not uniformly implement robust geolocation or age-verification, self-exclusion, or helpline placements required of licensed operators. Additionally, Polymarket's risk warnings are hard to locate behind continuously updating home-page content. Polymarket does not provide any resources or information to a bettor who is seeking responsible gambling messaging or help for financial loss or gambling addiction.

130. Given Polymarket has not obtained a license, Polymarket has not completed numerous steps New York requires sports betting platforms to complete prior to authorization and fails to be regulated by the New York Commission.

131. Under New York law, minors are prohibited from placing sports wagers, and individuals under the age of 21 are prohibited from gambling at licensed facilities. See N.Y. Comp. Codes R. & Regs. tit. 9, §§ 5313.2(b), 5329.19(a). Polymarket's failure to implement robust age verification mechanisms means that minors and underage individuals may be—and likely are—accessing and gambling on the platform in violation of New York law.

132. Even if a bettor voluntarily self-excludes from Polymarket, there is no indication whether that bettor would automatically be removed from all Polymarket marketing lists.

133. Defendants' illegal sportsbook actively undermines critical consumer protections required by New York law. For example, upon information and belief, Defendants allows anybody over the age of 18 to gamble on their platform in complete disregard for the laws prohibiting

individuals under the age of 21 to gamble in New York. *See, e.g.*, N.Y. RAC. PARI- MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor."); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities."); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee").

134.    Upon information and belief, Defendants further disregard the consumer protection laws that require casinos and sportsbooks to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9 § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by

the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877- 8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities."); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.").

135.    Moreover, New York law prohibits sports betting in New York on New York college sports teams. Yet, those exact wagers may be found on Polymarket. For example, in the image below Polymarket offers bets on Syracuse University's football team:

39



*Screen capture of Polymarket's website dated Feb. 2, 2026, displaying wagers on New*

*York college sports teams*

136.    On February 2, 2026, New York Attorney General Letitia James issued a "consumer alert warning New Yorkers of the risks posed by prediction markets," emphasizing that "these platforms operate without consumer protection and without the supervision of the New York Gaming Commission, putting New Yorkers at significant financial risk."[38] According to AG James, "***It's crystal clear: so-called prediction markets do not have the same consumer protections as regulated platforms***," and "***operate as unregulated gambling without the basic protections New***

---

[38] *Consumer Alert and Industry Alert: Attorney General James Warns New Yorkers of Potential Harms of Sports Betting and Prediction Markets*, https://ag.ny.gov/press-release/2026/consumer-alert-and-industry-alert-attorney-general-james-warns-new-yorkers, Feb. 2, 2026.

*York Consumers both deserve and expect*," such as "allocating resources to develop and fund programs to combat problem gambling, implementing procedures to prevent underage gambling, enforcing restrictions to prevent predatory or deceptive advertising, utilizing procedures to identify customers battling a gambling addiction, creating guardrails to allow consumers to exclude themselves from the platform, and upholding prohibitions against insider betting and requiring regulatory review to ensure the financial stability and integrity of gambling operators."[39]

137.    Thus, Polymarket's gambling platform is unlawful under New York law because Polymarket enables users to place wagers and bets on sporting events, and the games are by chance and unknown or contingent events that are independent of the action of placing the wagers and bets. *See* New York Consolidated Laws, General Obligations Law Section 5-401 ("Illegal wagers, bets and stakes", "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."; Section 5-411 ("Contracts on account of money or property wagered, bet or staked are void"), "[a]ll contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

138.    Under New York's version of the Statute of Anne, Plaintiffs and the Proposed Class may "sue for and recover the money or value" of the money lost to Polymarket for sports betting within three calendar months prior to the filing of a lawsuit. *See* New York Consolidated Laws, General Obligations Law Section 5-419 ("Property staked may be recovered"), "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited

---

[39] *Id.*

any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."; Section 5-421 ("Losers of certain sums may recover them"), "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof.

## VI.   *Polymarket Enables Unlawful Gambling in California*

139.   Polymarket makes its contract wagers as freely accessible to the public in the United States through its website and its mobile apps, including in California.

140.   Polymarket does not even attempt to reconcile its Polymarket Platform with California's ban on sports wagering.

141.   Despite Polymarket calling its services "shares" and "event contracts," in fact and substance consumers are placing wagers on the outcome of sporting events by using the Polymarket Platform.

142.   Polymarket's sporting event contracts and shares constitute unlawful gaming because Polymarket "deals, plays, or carries on, opens, or causes to be opened" and "conducts, either as owner or employee" and acts by taking a "bank or percentage", and allowing individuals to play or bet, in violation of California Penal Code Section 330.

143.   Polymarket's offering meets the definition of a "wager" under Section 337 because a user risks a sum of money (i.e. the price of the contract) on an uncertain occurrence in a sporting event (i.e. the position taken on the event contract) for the chance to win money if the event takes place (i.e. a prize). CAL. PENAL CODE § 337a(a)(4).

42

144. Polymarket's sporting event contracts concern "a contest" by which Polymarket offers a bet or wager, related to "skill, speed or power of endurance of [a] person", or, "between persons…or mechanical apparatus." CAL. PENAL CODE § 337a(a)(6).

145. Accordingly, Polymarket's sport events contracts are wagers on uncertain outcomes, structured and operated in a manner that meets the legal definition of sports wagering under California law.

146. For example, one of Polymarket's offerings displays a binary option of a winner of a contest, the perceived likelihood of either option winning, and a price on either option determined by that perceived likelihood. Polymarket pays out to the winner and nothing to the loser.

147. Such bets are moneyline wagers, which is "a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest." CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).

148. Moreover, Polymarket's wagering structure, including the ability to sell wagers to other users and the matching of buyers on opposite sides of a contract constitutes "exchange wagering." Exchange wagering allows bettors to bet or trade against one another rather than a "house".

149. In addition, Polymarket offers the ability to wager on sporting events while those events are taking place.

150. Put simply, the outcomes of the contests are contingent and unknown at the time the bets and wagers are collected and recorded (i.e., booked) by Polymarket. And as a result, Polymarket's contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and

337j.[40]

## VII.    *Polymarket's History*

151.    Polymarket is no stranger to regulatory scrutiny. In 2022, the Commodity Futures Trading Commission ("CFTC") entered an order against Polymarket, requiring that it pay a $1.4 million civil monetary penalty and that it facilitates the resolution (i.e. wind down) of all markets displayed on its website. Consequently, at that time, Polymarket ceased its operations in the United States.

152.    Specifically, in its January 3, 2022 enforcement order, the CFTC found that Polymarket's event contracts constitute "swaps" under the Commodity Exchange Act ("CEA"), and that Polymarket had operated an unregistered facility in violation of the CEA. The order required Polymarket to pay a $1.4 million civil monetary penalty and to wind down all markets on its platform, including by geo-blocking United States users.

153.    Following this order, Polymarket continued to grow internationally, becoming the world's largest prediction market by volume, while ostensibly barring U.S. users from accessing the platform.

154.    Following the CFTC's 2022 enforcement order, Polymarket restructured its operations by ceding nominal "operator" responsibilities for its international exchange to Adventure One QSS, Inc.. However, upon information and belief, this restructuring was largely cosmetic. For instance, Polymarket's CEO, Shayne Coplan, served as Adventure One's president

---

[40] In the alternative, Plaintiffs allege that the gambling contests offered in California by Polymarket constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

from December 2021 through April 2022 and remained a director of Adventure One thereafter.[41]

155.    As of around December 2025, Polymarket resumed offering its platform to U.S. consumers. In doing so, it continues to operate without proper licensing or regulatory oversight, effectively perpetuating the same unregulated activities that previously prompted federal enforcement. By presenting its betting platform as lawful and accessible, Polymarket exposes consumers to financial risk while evading the regulatory and statutory safeguards intended to protect them.

## VIII.    *Polymarket Fails to Warn Consumers of Legal Challenges to Its Sports Betting Operations*

156.    As previously referenced, Polymarket is purportedly regulated by the Commodity Futures Trading Commission (CFTC), but fails to adequately warn consumers that Polymarket is facing numerous legal challenges to their offering of sports wagering bets online.

157.    Multiple state regulators have taken the position that Polymarket's sports-event contracts constitute unlicensed sports wagering, issuing cease-and-desist directives in several jurisdictions. And that is likely to increase with time; State Attorneys Generals and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have sent letters to Polymarket's biggest competitor, Kalshi, ordering it to cease and desist its illegal sports betting platform.

158.    Moreover, in response to the Nevada Gaming Control Board's Complaint against Defendants, a Nevada state-court judge granted a temporary restraining order prohibiting

---

[41] What is Polymarket doing in Panama? https://www.sportico.com/business/sports-betting/2026/polymarket-panama-adventure-one-prediction-market-1234885035/ (When Coplan stepped down as president, he was replaced by Harry Jones, who simultaneously held the title of Director of Global Affairs at Polymarket. This confirms that Adventure One and Blockratize are far more intertwined than publicly represented.) (last accessed June 25, 2026).

Polymarket from operating in the state, and the court has now entered a preliminary injunction preventing Polymarket from operating there.

159. And while this increased regulatory pressure is of no surprise, it is necessary; "the average prediction market user loses twice as much of every dollar they bet, compared to users of traditional sportsbooks."[42]

## IX.   *Polymarket Acted with Malice, Oppression, and Fraud.*

160. As detailed in this Complaint, Polymarket has acted with malice, oppression, and fraud.

161. Polymarket acted with malice because, among other reasons and as otherwise detailed in this Complaint, Polymarket's conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiffs, and the Class because Polymarket knew (or should have known) that its gambling operations were illegal, but despite that induced Plaintiffs and the Class to gamble and lose money through its platform. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

162. Polymarket's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiffs and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that Polymarket held out as being legal.

163. Polymarket's conduct was fraudulent because, among other reasons and as otherwise detailed in this Complaint, Polymarket intentionally misrepresented and concealed the

---

[42] https://x.com/JonathanDCohen1/status/2019059550859493656?s=20 (last visited Feb. 4, 2026)

46

true nature of its unlawful gambling enterprise from Plaintiffs and the Class by affirmatively representing that its platform and associated contests were legal when Polymarket knew (or should have known) that such contests were not.

## X.    *No Adequate Remedy at Law*

164.    Plaintiffs and the Classes have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of Defendants' violation of law and wrongful conduct alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue. Legal remedies available to Plaintiffs and class members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. As such, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages. Further, damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds have grown far greater than the legal rate of interest would recognize. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

165.    Equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their use of the Polymarket Platform is determined to be an amount less than paid to use the Polymarket Platform. Without compensation for the full amount paid, Plaintiffs would be left without the remedy they are entitled to in equity.

## FACTS SPECIFIC TO PLAINTIFFS

### I.    *Plaintiff San Diego's Experience*

166.    In response to Polymarket's online advertising and representations described above, and under the belief that he was engaging in "legal" sports betting, Plaintiff San Diego wagered on Polymarket in California from approximately September 2025 to November 2025.

167.    Plaintiff San Diego accessed Polymarket and Plaintiff San Diego placed wagers on sporting events on Polymarket.

168.    Plaintiff San Diego placed a substantial amount of sports wagers on Polymarket.

169.    Overall, Plaintiff San Diego wagered and lost thousands of dollars in real-world currency while using Polymarket and betting on its offering of sports games and events.

170.    By and through Polymarket's gambling features described above, during the time period of approximately September 2025 to November 2025, Plaintiff San Diego was induced into placing sports bets that he otherwise would not have made if he knew that Polymarket's platform constituted illegal gambling in violation of numerous state laws.

171.    Since that time, Polymarket has continued to represent to Plaintiff San Diego, including on the Polymarket Platform, that its services are legal in California.

172.    In using his Polymarket account during this time, Plaintiff San Diego expressly relied upon Polymarket's representations that the services it provides in California are legal.

173.    If Polymarket had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff San Diego would not have placed bets while in California through Polymarket's gambling website. If Polymarket had not solicited bets and wagers from Plaintiff San Diego while representing that such activities were legal (when, unknown to Plaintiff San Diego at the time, they in fact were not legal), he would not have made any of

those bets or wagers and would not have paid any money to Polymarket.

174. In Plaintiff San Diego's experience, Polymarket serves as the "house," setting the betting lines, taking bets and wagers from all users, documenting (i.e., "booking") those bets, using its records to determine "winners" and "losers," and eventually paying out the winners.

175. As a result of Defendants' unfair, unlawful, and deceptive acts, Defendants were unjustly enriched.

176. Plaintiff San Diego has not used the Polymarket Platform since approximately November 2025. However, Plaintiff San Diego enjoys legally wagering on sports and has an ongoing interest in utilizing Polymarket's platform if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff San Diego therefore has an ongoing interest in Polymarket complying with state and federal gambling laws and consumer protection statutes.

177. To the extent a contract was formed between Plaintiff San Diego and Polymarket, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

178. Defendants' representations regarding the legality of their sports betting platform are unlawful, unfair, deceptive, and misleading, because Defendants failed to warn consumers that the platform is illegal, while allowing consumers, including Plaintiff San Diego, to rely on those representations in deciding to utilize Defendants' platform.

179. Defendants' representations were material to Plaintiff San Diego's decision to utilize Polymarket.

180. Had Plaintiff San Diego known that Defendants' platform was an illegal sports betting enterprise, Plaintiff San Diego would not have utilized Polymarket. In other words, Defendants' representation of legality was important to Plaintiff's decision to utilize Polymarket.

181. Each time Plaintiff San Diego and putative Class members utilized Polymarket, they relied on Defendants' representations in their purchasing decisions, as is typical of most U.S. consumers.

182. Plaintiff San Diego was harmed because Defendants took Plaintiff San Diego's money due to their unlawful, false, unfair, and deceptive misrepresentations of their product, including the product Plaintiff utilized.

183. Although Plaintiff San Diego would like to utilize Polymarket in the future, Plaintiff San Diego cannot be certain that he will not be misled again unless and until Defendants accurately represent their products and services.

## II.    *Plaintiff Yoon's Experience*

184. In response to Polymarket's online advertising and representations described above, and under the belief that he was engaging in "legal" sports betting, Plaintiff Yoon wagered on Polymarket in California from approximately December 2025 to January 2026.

185. Plaintiff Yoon accessed Polymarket and Plaintiff Yoon placed wagers on sporting events on Polymarket.

186. Plaintiff Yoon placed a substantial amount of sports wagers on Polymarket and lost approximately $5,000 on Polymarket while in California. He also lost approximately $5,000 in prior winnings that he was unable to withdraw due to problems with the Polymarket Platform.

187. Overall, Plaintiff Yoon wagered and lost thousands of dollars in real-world currency while using Polymarket and betting on its offering of sports games and events.

188. By and through Polymarket's gambling features described above, during the time period of approximately December 2025 to January 2026, Plaintiff Yoon was induced into placing sports bets that he otherwise would not have made if he knew that Polymarket's platform

constituted illegal gambling in violation of numerous state laws.

189. Since that time, Polymarket has continued to represent to Plaintiff Yoon, including on the Polymarket Platform, that its services are legal in California.

190. In using his Polymarket account during this time, Plaintiff Yoon expressly relied upon Polymarket's representations that the services it provides in California are legal.

191. If Polymarket had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Yoon would not have placed bets while in California through Polymarket's gambling website. If Polymarket had not solicited bets and wagers from Plaintiff Yoon while representing that such activities were legal (when, unknown to Plaintiff Yoon at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to Polymarket.

192. In Plaintiff Yoon's experience, Polymarket serves as the "house," setting the betting lines, taking bets and wagers from all users, documenting (i.e., "booking") those bets, using its records to determine "winners" and "losers," and eventually paying out the winners.

193. As a result of Defendants' unfair, unlawful, and deceptive acts, Defendants were unjustly enriched.

194. Plaintiff Yoon has not used the Polymarket Platform since approximately January 2026. However, Plaintiff Yoon enjoys legally wagering on sports and has an ongoing interest in utilizing Polymarket's platform if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff Yoon therefore has an ongoing interest in Polymarket complying with state and federal gambling laws and consumer protection statutes.

195. To the extent a contract was formed between Plaintiff Yoon and Polymarket, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in

this Complaint.

196.    Defendants' representations regarding the legality of their sports betting platform are unlawful, unfair, deceptive, and misleading, because Defendants failed to warn consumers that the platform is illegal, while allowing consumers, including Plaintiff Yoon, to rely on those representations in deciding to utilize Defendants' platform.

197.    Defendants' representations were material to Plaintiff Yoon's decision to utilize Polymarket.

198.    Had Plaintiff Yoon known that Defendants' platform was an illegal sports betting enterprise, Plaintiff Yoon would not have utilized Polymarket. In other words, Defendants' representation of legality was important to Plaintiff's decision to utilize Polymarket.

199.    Each time Plaintiff Yoon and putative Class members utilized Polymarket, they relied on Defendants' representations in their purchasing decisions, as is typical of most U.S. consumers.

200.    Plaintiff Yoon was harmed because Defendants took Plaintiff Yoon's money due to their unlawful, false, unfair, and deceptive misrepresentations of their product, including the product Plaintiff utilized.

201.    Although Plaintiff Yoon would like to utilize Polymarket in the future, Plaintiff Yoon cannot be certain that he will not be misled again unless and until Defendants accurately represents its products and services.

## CLASS ALLEGATIONS

202.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of themselves and all others similarly situated defined as follows:

203.    The proposed Classes are defined as follows:

**Nationwide Class**: All United States residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**New York Class**: All New York residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**Statute of Anne Multistate Class**: All residents of Statute of Anne States who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

**California Class**: All California residents who, during the applicable limitations period, spent money wagering on Polymarket's mobile or web sportsbook.

204. The "Statute of Anne States" means Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1-2); Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Maryland (Md. Code Ann., Crim. Law § 12-110), Michigan (Mich. Comp. Laws §§ 750.315(1), 600.2939(1)), Mississippi (Miss. Code Ann. § 87-1-5 (except as to certain counties and on certain boats), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), West Virginia (W. Va. Code § 55-9-2), Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.20), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.740), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. § 895.056).

205. The Nationwide Class, New York Class, Statute of Anne Multistate Class, and the California Class are collectively referred to herein as the "Class," unless specified otherwise.

206.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

207.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiffs currently but may be ascertained from Defendants' books and records and other third-party sources.

208.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

    a.   Whether the sports betting in Polymarket is gambling as defined under applicable state law;

    b.   Whether Defendants engaged in the conduct alleged in the Complaint;

    c.   Whether Defendants violate the statutes listed below;

    d.   Whether Defendants violated statutes analogous to those alleged herein applicable;

    e.   Whether Plaintiffs and the other Class members were damaged by Defendants' conduct;

f.  Whether Plaintiffs and the other Class members are entitled to  restitution or other relief;

g.  Whether Polymarket violated New York Racing, Pari-Mutuel Wagering and Breeding Law § 1367;

h.  Whether Polymarket's representations about the legality of sports betting in New York and California were true or misleading;

i.  Whether Polymarket violates California gambling laws, including California Penal Code §§ 319, 330, 330a, 337a, and 337j;

j.  Whether Polymarket's conduct violates established public policy against unlicensed online sports betting;

k.  Whether the sports betting contracts on Polymarket's platform are void under applicable law; and

l.  Whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, and other equitable relief.

209.  **Typicality**. Plaintiffs' claims are typical of the claims of the Class because they are players of Polymarket who wagered real-world currency on sports games and events as a result of Defendants' unlawful and wrongful conduct. The factual and legal basis of Defendants' liability to Plaintiffs and to the other Class members is the same, resulting in injury to Plaintiffs and to all of the other members of the Class. Plaintiffs and the other members of the Class have suffered harm and damages due to Defendants' unlawful and wrongful conduct.

210.  **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

211.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiffs and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

212.    **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to the Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the New York Loss Recovery Act**
**N.Y. Gen. Oblig. L. § 5-419**
*(On Behalf of Plaintiffs, the Nationwide Class, and the New York Class)*

213.    Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

214.    Plaintiffs bring this count individually and on behalf of the Class under New York General Obligation Law § 5-419, which was enacted to effectuate the State's public policy against

unlawful gambling.

215. All forms of unlicensed gambling—including wagers, bets, or stakes—based on games of chance are unlawful in New York. N.Y. Gen. Oblig. L. § 5-401.

216. Section 5-419 of the Loss Recovery Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." N.Y. Gen. Oblig. L. § 5-419.

217. Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager or bet—and permits the person who paid or lost the money to recover it from the recipient.

218. Defendants' gambling sportsbook solicits "wager[s] or bet[s] prohibited" because it invites users to play games of chance (e.g., betting on the outcomes of sporting events) for money, which constitutes illegal gambling under both New York civil and penal law. *See* N.Y. Gen. Oblig. L. § 5-401 ("All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."); N.Y. Penal Law § 225.00 (defining "gambling" as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance" and defining "gambling device," as "any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine."); N.Y. Penal Law §§ 225.05225.10 (making advancing and profiting from unlawful gambling a misdemeanor or felony).

219.  Defendants' online sportsbook platform is an internet site that permits consumers to play games of chance (e.g., bet on the outcome of sporting events) for money.

220.  Every wager offered on Defendants' online platform is a "gambling device" because it accepts money from players, operates on chance as it relies on the outcomes of sporting events and games, and enable players to stake, hazard, and bet money with the potential to win or lose money.

221.  Defendants are considered the "winner" because they derive a financial benefit from the gambling activity. Every transaction generates revenue for Defendants, meaning their financial interest is tied to facilitating the illegal gambling alleged herein.

222.  Defendants are also a "stakeholder" under this provision of the Loss Recovery Statute because, on information and belief, the money wagered by Plaintiffs and the Class on Defendants' platform is delivered or deposited into accounts owned or controlled by it.

223.  By purchasing, wagering, and losing money on Defendants' sports betting platform, Plaintiffs and each member of the Class gambled and lost money.

224.  Defendants own, operate, and control the gambling games described herein, and directly profited from Plaintiffs' and the Class members' gambling losses. Defendants are therefore the "winner" under N.Y. Gen. Oblig. Law § 5-419 of all moneys lost by Plaintiffs and the Class members.

225.  Defendants operate an illegal gambling website that is accessible Nationwide, including in New York.

226.  Defendants operate its illegal gambling enterprise from its headquarters in New York. Defendants also process online consumer payments in New York.

227.  Plaintiffs, on behalf of themselves and the New York and Nationwide Class

58

members, seek an order requiring Defendants to (1) cease the operation of their gambling business, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law §§ 5-419 and -421.

## SECOND CAUSE OF ACTION
### Violation of New York General Business Law § 349 (Deceptive Acts and Practices)
*(On Behalf of Plaintiffs, the Nationwide Class, and the New York Class)*

228.    Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

229.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a).

230.    N.Y. Gen. Bus. Law § 349 applies to Defendants' actions and conduct as described herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or practices in business transactions, including those involving the marketing and sale of goods or services to New York consumers.

231.    Plaintiffs and the members of the Class are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

232.    Defendants engaged in consumer-oriented conduct by marketing Polymarket as legal sports betting, when it is unlicensed, and while concealing the fact that its platform constitutes unlawful gambling with real financial risks. Defendants' Platform is expressly directed to consumers and seeks to obtain their money.

233.    Defendants also violated § 349 by misrepresenting its products as "prediction markets" when it is an addictive and dangerous gambling enterprise, and by misrepresenting their Platform as legal when in reality Polymarket offered illegal unlicensed gambling.

234.    Defendants' practices described herein, including the operation of an illegal sports

betting casino, are deceptive under N.Y. Gen. Bus. Law § 349 because they contravene New York's public policy against unlawful and unregulated gambling, and caused substantial injury to the consumers who wagered on Polymarket.

235. Defendants' conduct was material because it was likely to deceive reasonable consumers about the probability of winning their games, the lawfulness of their business and services offered, and whether they were engaged in an addictive behavior.

236. Defendants caused substantial injury to Plaintiffs and the Class by inducing them to wager real-world currency through the design of its illegal gambling platform. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

237. Defendants' unfair practices occurred during the marketing and sale of sports wagers on Polymarket's illegal gambling platform, and thus, occurred in the course of trade and commerce.

238. Further, Defendants conceal from consumers, including Plaintiffs and the Class, that wagering on its platform constitutes illegal gambling prohibited by state law.

239. To make matters worse, upon information and belief, Defendants disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 9, § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by

the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (8778-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission"); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1 ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities"); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements").

240. Defendants aggressively market and advertise its platform through various media while at the same time concealing that it is illegal under state law. As such, consumers, including Plaintiffs and the Class, are highly likely to continue to encounter current and future iterations of Defendants' illegal platform absent injunctive relief.

241. Further, Defendants' conduct is deceptive because it is designed to encourage illegal gambling while marketing the platform as a legal avenue to engage in sports betting, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

242. These deceptive practices are material and likely to mislead reasonable consumers,

61

who are led to believe they are participating in legal sports betting rather than unlawful, unregulated gambling.

243. Polymarket's conduct described herein was willful.

244. As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law § 349, Plaintiffs and Class members have suffered actual injury in the form of monies lost wagering on Defendants' platform.

245. Plaintiffs, on behalf of themselves and the New York and Nationwide Class members, seek an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any sports wager to Plaintiffs and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

## THIRD CAUSE OF ACTION
### Violation of New York General Business Law § 350 (False Advertising)
### *(On Behalf of Plaintiffs, the Nationwide Class, and the New York Class)*

246. Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

247. N.Y. Gen. Bus. Law § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1).

248. Defendants engaged in false advertising by marketing and promoting Polymarket as legal sports betting across all 50 states, when in fact Defendants operate an unlawful online gambling platform that allows players to wager real-world currency for money.

249. Defendants further misrepresent sports betting on Polymarket as simply a

byproduct of its "predictions market" platform rather than an unlicensed online sportsbook. By doing so, Defendants mislead consumers into believing the platform is lawful and does not constitute illegal sports wagering involving real financial risk.

250. Defendants' advertisements fail to disclose that the Polymarket sports betting platform operates in violation of New York law, that consumers are engaging in real-money gambling, and that users are wagering things of value that can be lost while wagering on Defendants' platform. These omissions are material because they would influence a reasonable consumer's decision to engage with and make purchases on Defendants' platform.

251. A reasonable consumer is likely to be misled by Defendants' advertising into believing that Polymarket offers legal sports betting rather than unlawful gambling with real financial risks.

252. Defendants' false advertising was directed at the public at large and occurred in the course of Defendants' business practices within New York.

253. Defendants aggressively market Polymarket through targeted advertisements on social media, digital marketing campaigns, and other promotional efforts aimed at attracting nationwide and New York consumers. These advertisements emphasize legal sports wagering, large potential winnings, and enticing promotions while concealing the true nature of Defendants' illegal gambling operation.

254. Defendants' false and misleading advertising deceived Plaintiffs and Class members, leading them to engage with and place wagers through Polymarket under the mistaken belief that they were not participating in illegal gambling.

255. As a direct and proximate result of Defendants' false advertising, Plaintiffs and the Class have suffered actual damages in the form of monies lost on Defendants' illegal gambling

platform.

256. Plaintiffs, on behalf of themselves and the New York and Nationwide Class members, seek an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any sports wager to Plaintiffs and the Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**FOURTH CAUSE OF ACTION**
**Violation of N.Y. Gen. Oblig. L. § 5-421**
*(On Behalf of Plaintiffs, the Nationwide Class, and the New York Class)*

257. Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

258. N.Y. Gen. Oblig. L. § 5-421 states that "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

259. Within the past three months, Plaintiffs each deposited at least twenty-five dollars into accounts owned and controlled by Defendants for the purpose of engaging in what Plaintiffs were misled to believe was lawful sports betting, but in reality, was unlawful betting and/or wagering.

260. Plaintiffs lost the money they deposited by engaging in Defendants' unlawful betting and/or wagering games.

261. Pursuant to N.Y. Gen. Oblig. L. § 5-421, Plaintiffs and the New York and Nationwide Class are entitled to recover from Defendants all funds lost in connection with Defendants' unlawful sports betting and/or wagering enterprise.

262. Accordingly, Plaintiffs and the New York and Nationwide Class seek all damages, restitution, attorneys' fees, and costs of suit and/or injunctive relief.

**FIFTH CAUSE OF ACTION**
**Unlawful & Unfair Business Practices in Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(*On behalf of Plaintiffs and the California Class*)**

263. Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the California Class.

264. California's Unfair Competition Law ("UCL") broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200.

265. Plaintiffs and Defendants are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

266. Plaintiffs have standing under the UCL because they suffered an injury in fact and lost money or property as a result of Defendants' unlawful and unfair conduct.

267. By hosting and facilitating the unlawful online sports betting platform at issue here, Defendants engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful and unfair business acts and practices. Polymarket has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing operation of a Gambling Website and contests are lawful in California, when in fact, they are not, causing Plaintiffs and the Class to be tricked out of significant sums of money.

268. Unlicensed sports wagering has long been outlawed in California. The sportsbook offered on Defendants' platform constitutes illegal sports betting as directly prohibited by California law.

269.    Defendants' conduct as alleged herein occurred in the course of trade or commerce.

270.    As described herein, Defendants have committed unlawful and unfair business acts or practices in violation of the UCL.

271.    **Fraudulent Prong:** Defendants engage in fraudulent business practices by misrepresenting the sports betting it offers as legal sports betting, when it is unlicensed and unregulated.

272.    **Unlawful Prong:** Defendants engage in unlawful business practices by operating prediction markets in California that are in fact illegal sports wagers prohibited under Penal Code § 337a. Funds wagered in Polymarket's platform are wagers on the uncertain performance of third-party athletes and teams in real-world contests. The Attorney General of California has previously concluded that such contests are unlawful gambling under California law. As a result of engaging in the conduct alleged in this Complaint, Defendants violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, *inter alia*, the following laws:

   a. **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800,** *et seq.***)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Polymarket's prediction markets constitute unlawful "gambling games" because they are games "played

for currency… or any other thing of value" in which money is staked upon the outcome of uncertain athletic events. Cal. Penal Code § 337j(a)(1). Defendants have not applied for or obtained any state gambling license as statutorily required by California law, and therefore violate California's Gambling Control Act.

b. **California Penal Code § 330a**: Section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Polymarket's platform constitutes such a contrivance: consumers deposit money through the website to stake on athletic outcomes set by the operator, and winnings or losses are determined by the operation of

Defendants' software. Defendants' conduct therefore plainly violates Penal Code § 330a.

c. **California Penal Code § 330b**: Section 330b prohibits the manufacture, possession, or operation of "any slot machine or device" that awards money or things of value depending on chance. Polymarket's mobile software functions as a prohibited "device" under this statute. The combination of Polymarket's platform and consumers' mobile devices transforms phones into gambling machines in this context. Indeed, users "deposit" entry fees, the system calculates outcomes based on uncertain sporting events, and the app pays out money or credits to winning users. Defendants therefore violate Penal Code § 330b.

d. **California Penal Code § 337j(a)(1)**: Defendants violate Cal. Penal Code § 337j(a)(1) by "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed sports gambling in California through its platform.

e. **California Penal Code § 337j(a)(2)**: Defendants violate Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Polymarket profits by retaining a guaranteed transaction fee from every wager placed on its platform.

f. **California Penal Code § 319:** Polymarket's platform constitutes a lottery under California law, which defines a lottery as "any scheme for the disposal or distribution of property by chance, among persons who have

68

paid or promised to pay any valuable consideration for the chance of obtaining such property." Cal. Penal Code § 319. Every person who "contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor." Cal. Penal Code § 320.

g. **California Penal Code § 337a:** Defendants also violate Cal. Penal Code § 337a, which prohibits pool selling and bookmaking. Under California law, bookmaking includes taking bets on sporting events, and "[t]he taking of one bet is sufficient" to establish a violation. *People v. Thompson*, 206 Cal. App. 2d 734, 739 (Cal. Ct. App. 1962). A "banking game" is one in which the house is a participant that takes on all comers, and a "percentage game" is one in which the house collects a portion of the bets. *Sullivan v. Fox*, 189 Cal. App. 3d 673, 678-79 (Cal. Ct. App. 1987). Polymarket's sports betting platform, which charges transaction fees on every wager, operates as both. California Bus. & Prof. Code § 19801(d) expressly provides that "[n]o person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Defendants have not obtained any license from the State of California to operate a gambling enterprise, and no such license exists for online sports betting in the state.

h. **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the "IGBA"):** The IGBA declares it a crime to "conduct, finance, manage, supervise, direct, or own all of part" of an illegal gambling business. Defendants violate the IGBA because their business involves five or more

persons, has been in continuous operation for more than thirty days, and violates California's gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct alleged herein, Defendants squarely violate 18 U.S.C. § 1955.

i. **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) (the "UIGEA"):** The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly accept payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is defined as placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(a). Polymarket knowingly accepts deposits from consumers in California to fund its illegal sportsbook. Because these wagers are unlawful under California law, they also constitute "unlawful Internet gambling" within the meaning of the UIGEA. By accepting consumer payments in connection with these illegal wagers, Defendants violate the UIGEA.

273.    **Unfair Prong:** The acts and practices of Polymarket as alleged herein also constitute "unfair" business acts and practices under the UCL because Polymarket's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Polymarket's conduct outweighs any conceivable benefit of such conduct.

274.    Through its unfair, unlawful, and deceptive acts and practices, Defendants improperly obtained money from Plaintiffs and members of the Class. Plaintiffs and the California Class have suffered injury in fact—in the form of all amounts paid to Polymarket and/or the total of net losses on a Gambling Website run by Polymarket for bets placed within California—as a result of Polymarket's unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined. As a direct and proximate cause of Defendants' deceptive and unfair trade practices, Plaintiffs and other members of Class suffered an injury in fact and/or lost money and property as described above.

275.    Plaintiffs seek all available equitable remedies under the UCL. Specifically, Plaintiffs and the California Class seek an order providing recission of all contracts, and equitable restitution and/or equitable disgorgement in the form of all amounts paid to Polymarket by Plaintiffs and the California Class and/or the total of net losses on the Gambling Website by Plaintiffs and the Class for bets placed within California. Bus. & Prof. Code § 17203. Plaintiffs also seek an injunction on behalf of the general public enjoining Defendants from continuing to engage in the conduct described herein as Defendants' wrongful conduct continues to be ongoing.

276.    As such, Plaintiffs respectfully request that this Court cause Defendants to restore this money to Plaintiffs and members of the California Class, and to enjoin Defendants from continuing to violate the UCL. Otherwise, Plaintiffs and members of the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

277.    Plaintiffs and the Class lack an adequate remedy at law. Moreover, Plaintiffs assert this cause of action in the alternative to his claims for damages.

278.    Additionally, Plaintiffs and the Class members seek an order requiring Defendants to

71

pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

**SIXTH CAUSE OF ACTION**
**Violation of CLRA, Cal. Civ. Code § 1750, *et seq.***
**(*On behalf of Plaintiffs and the California Class*)**

279.    Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

280.    Plaintiffs bring this cause of action on behalf of themselves and the California Class.

281.    The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.,* prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result, or which results, in the sale or lease of goods or services to a consumer.

282.    Plaintiffs and each member of the proposed Class are consumers as defined by Cal. Civ. Code. § 1761(d).

283.    Polymarket's online platform and mobile app constitutes a "service" within the meaning of by Cal. Civ. Code. § 1761(b).

284.    Defendants violated, and continue to violate, the CLRA by, *inter alia*, misrepresenting the sports betting offered on Polymarket as "legal sports betting," when it is unlicensed and unregulated; representing that its services are legal and permitted in California when they are not; and deceiving or confusing reasonable consumers about the probability of winning their bets, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior. Polymarket violated the CLRA by, among other things:

   a.   "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

72

b.  "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

c.  **"**Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

d.  "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

e.  "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

f.  "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

g.  "Inserting an unconscionable provision in the contract" (a)(19).

285.    Defendants' wrongful conduct deceives and confuses customers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winning and the obligation to pay for losses), when in fact any such rights, remedies or obligations are prohibited by law.

286.    Defendants misrepresented and marketed their platform as a "prediction market" while actually offering illegal sports-betting and/or wagering that are identical to those found in traditional sportsbooks.

287.    Defendants' conduct and actions are deceptive, untrue, and misleading to reasonable consumers, and will continue to mislead consumers in the future.

288.     Plaintiffs and the California Class relied on Defendants' advertisements, representations and/or omissions. Had they known the true nature of Polymarket's platform, they would not have paid Defendants money or used Polymarket.

289.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and the California Class members have suffered and will continue to suffer actual damages.

290.     Defendants' wrongful conduct is ongoing and presents a continuing threat to Class members. Polymarket's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the California Class for Defendants' own benefit to the detriment of Plaintiffs and the California Class.

291.     Moreover, the contracts between Plaintiffs and Defendants are void and were void ab initio because the sole purpose of the contracts was to facilitate unlawful gambling activities in California. Under Cal. Civ. Code § 1667, a contract is unlawful where it is: (1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals. Because online sports betting is illegal in California and has been overwhelmingly rejected by California voters, the contracts at issue are void under all three prongs.

292.     Pursuant to § 1782(a) of the CLRA, Plaintiffs have each notified all Defendants in writing by certified mail of its particular violations of § 1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above, and given notice to all affected consumers of Defendants' intent to act.

293.     Plaintiffs seek all available remedies under the CLRA including monetary relief, equitable monetary relief, injunctive relief, attorneys' fees, and reasonable costs of suit

**SEVENTH CAUSE OF ACTION**
**Violation of Cal. Civ. Code § 22.2 and the Statute of Anne**

74

*(On Behalf of Plaintiffs and the California Class)*

294.    Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

295.    Plaintiffs and the California Class Members all lost more than "ten Pounds" during the "playing or betting in the whole, the Sum of Value" within "three Months" as provided within the meaning of Cal. Civ. Code § 22.2, and by extension the Statute of Anne.

296.    Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, each Plaintiff is a "Person," as they lost money to Defendants using their gambling services. Defendants received all or part of the money Plaintiffs lost to Defendants. Plaintiffs have not colluded with any other individuals in bringing this action.

297.    Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, Polymarket is the "winner," as they received all or part of the money lost by Plaintiffs and the Class Members using Defendants' gambling services.

298.    One of the statutes of Parliament that was effective in 1850 (and therefore incorporated into California law) was the Gaming Act of 1710, commonly referred to as the "Statute of Anne." A recent binding decision of the Court of Appeal confirms that the Statute of Anne was carried over as part of Civil Code Section 22.2: "California imported not only the whole body of judge-made decisional law of the English courts, but also the written statutes enacted by Parliament. Among the enactments of Parliament adopted as California common law was the Statute of Anne, which declared all gambling debts utterly void, frustrate, and of none effect, to all intents and purposes whatsoever." *Tak Chun Gaming Promotion Co. v. Long*, 96 Cal. App. 5th 1027, 1033 (2023) (cleaned up).

299.    Since 1850, California continues to maintain the Act, and it is currently codified at

Cal. Civ. Code § 22.2. Courts have determined that when California imported the English common law, California imported not only the "whole" "body of judge-made" decisional law of the English courts, but "also the written statutes enacted by Parliament." *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 314 Cal. Rptr. 3d 890, 895 (2023), as modified on denial of reh'g (Nov. 17, 2023) (cleaned up).

300.   On April 13, 1850, California passed an "Act adopting the Common Law," which read: "The Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, shall be the rule of decision in all Courts of this State."

301.   Like many U.S. states, in the early days of statehood, California looked to the English common law as a model for its state law.

**EIGHTH CAUSE OF ACTION**
**Violation of Cal. Penal Code § 496(c)**
***(On Behalf of Plaintiffs and the California Class)***

302.   Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

303.   As alleged above, Polymarket's advertisements induced Plaintiffs to wager significant amounts of money via the Gambling Websites on the false pretense that Defendants' sports betting platform was legal in California. Defendants' purpose in making these false pretenses was to illegally take money from Plaintiffs and the California Class.

304.   Pursuant to California Penal Code section 496(a) receiving property "that has been obtained in any manner constituting theft" is a criminal offense punishable by imprisonment. Pursuant to California law, procuring funds by false pretenses constitutes a violation of Section 496(a). Pursuant to Section 496(c), any person that violates Section 496(a) is liable for three times

the actual damages as well as attorney's fees.

305.    Defendants' conduct alleged above constitutes a violation of Penal Code section 496(a) entitling Plaintiffs and the California Class to the relief provided by Section 496(c) including treble damages and reasonable attorney's fees.

## NINTH CAUSE OF ACTION
### Unjust Enrichment
*(On behalf of Plaintiffs, the Nationwide Class, the New York Class, the California Class, and the Statute of Anne Multistate Class)*

306.    Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

307.    Plaintiffs and the Class members have conferred a benefit upon Defendants in the form of the money they wagered on Defendants' illegal sportsbook platform.

308.    Defendants appreciate and have knowledge of the benefits conferred upon it by Plaintiffs and the Class.

309.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiffs and the Class members, which Defendants have unjustly obtained as a result of their unlawful operation of wagering sports games. As it stands, Defendants have retained millions of dollars in profits generated from Polymarket's unlawful sports betting and should not be permitted to retain those ill-gotten profits.

310.    Damages are not equally certain as restitution because the standard that governs restitution is different. A court may award restitution even if damages are insufficiently proven. Unlike damages, restitution is not limited to wrongfully acquired money plus the legal rate of interest; rather, restitution entitles Plaintiffs to recover all profits from Defendants' wrongdoing, even where the original funds have grown far greater than the legal rate of interest. These significant differences in proof and certainty establish that a potential legal claim cannot serve as

an adequate remedy at law. Plaintiffs and the Class lack an adequate remedy at law because the damages suffered by Plaintiffs and Class members, if determined to be the amount less than paid to use Polymarket, would leave Plaintiffs without a full remedy without equitable restitution.

311.    Accordingly, Plaintiffs and the Class members seek full disgorgement of all money Defendants have retained as a result of the wrongful conduct alleged herein.

## TENTH CAUSE OF ACTION
### Statutes of Anne
### *(On behalf of Plaintiffs and the Statute of Anne Multistate Class)*

312.    Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–212 by reference as if fully set forth herein.

313.    The statutes of numerous states authorize persons to recover gambling losses, as described herein. These statutes include Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1-2); Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Maryland (Md. Code Ann., Crim. Law § 12-110), Michigan (Mich. Comp. Laws §§ 750.315(1), 600.2939(1)), Mississippi (Miss. Code Ann. § 87-1-5 (except as to certain counties and on certain boats), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), West Virginia (W. Va. Code § 55-9-2), Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.20), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.740), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin

(Wis. Stat. § 895.056).

314.    Within the meaning of the above states, Plaintiffs and the Statute of Anne Multistate Class Members are persons who lost money placing bets, wagers, stakes, deposits and the like with Polymarket. Defendants received that money. Accordingly, Plaintiffs and the Statute of Anne Multistate Class seek to recover those losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class(es) as requested herein, appointing Plaintiffs as class representative and their counsel as class counsel;

2.    Awarding Plaintiffs all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.    Awarding Plaintiffs and the class members appropriate relief, including actual and statutory damages;

4.    Awarding Plaintiffs' reasonable attorneys' fees, costs, and other litigation expenses;

5.    Awarding pre- and post-judgment interest, as allowable by law;

6.    For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7.    Declaratory and equitable relief, including restitution and disgorgement;

8.    For public injunctive and declaratory relief as the Court may deem proper; and

9.    Awarding treble damages and reasonable attorney's fees pursuant to California Penal Code Section 496(c);

10.　　Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: June 25, 2026　　　　　　　　　　　　Respectfully submitted,


By: */s/ Leanna A. Loginov*
Leanna A. Loginov (NY Bar No. 5894753)
Edwin E. Elliott, *pro hac vice* to be filed
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
lloginov@shamisgentile.com
edwine@shamisgentile.com

Omer Kremer, *pro hac vice* to be filed
Gabriel Mandler, *pro hac vice* filed
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Tel: (786) 289-9470
omer@edelsberglaw.com
gabriel@edelsberglaw.com

Wesley M. Griffith, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

David A. McGee, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
609 H Street NE
Ste. 445
Washington, DC 20001
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

James Bilsborrow (SDNY# JB8204)
Aaron Freedman NY Bar No. 6015036
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Telephone: 212-344-5461
E-mail: jbilsborrow@weitzlux.com
E-mail: afreedman@weitzlux.com

Michael Piggins, *pro hac vice* to be filed
**WEITZ & LUXENBERG PC**
3011 W. Grand Blvd., Fl. 24
Detroit, MI 48202
Telephone: 231-366-3108
E-mail: mpiggins@weitzlux.com

Margot P. Cutter, *pro hac vice* to be filed
Charles B. Stevens, *pro hac vice* to be filed
**CUTTER LAW, P.C.**
401 Watt Ave.
Sacramento, CA 95864
(916) 290-9400
Email: mcutter@cutterlaw.com
Email: cstevens@cutterlaw.com

F. Peter Silva II, *pro hac vice* to be filed
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 510-588-5299
E-mail: psilva@tzlegal.com

Katherine M. Aizpuru, NY Bar No. 5305990
Robert M. Devling, *pro hac vice* to be filed
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: 202-973-0900
E-mail: kaizpuru@tzlegal.com
E-mail: rdevling@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*

81